

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP/SK:RMP                                    *271 Cadman Plaza East*
F. #2019V01114                                *Brooklyn, New York 11201*

March 17, 2021

<u>By ECF</u>

The Honorable Frederic Block
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Betim Kaziu
     <u>Criminal Docket No. 09-660 (FB)</u>

Dear Judge Block:

   The government respectfully submits this letter (1) to advise the Court that, based on recent authority within this Circuit, <u>de novo</u> resentencing is not necessary in this case;[1] and (2) to respond to the arguments in the defendant's resentencing brief (ECF No. 300), and serve as the government's substantive submission in the event that Your Honor decides to resentence the defendant.

   On July 7, 2011, a jury found the defendant guilty of four counts: Conspiracy to Commit Murder in a Foreign Country, in violation of 18 U.S.C. § 956 (Count One), Conspiracy to Provide Material Support to Terrorists, in violation of 18 U.S.C. § 2339A (Count Two), Attempt to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B (Count Three), and Conspiracy to Use a Firearm, in violation of 18 U.S.C. § 924(o) (Count Four).  Following the verdict, the defendant moved for a judgment of acquittal, and the trial judge—former U.S. District Judge John Gleeson—denied the motion, ruling that the trial evidence established that, <u>inter alia</u>, "the defendant . . . agreed . . . to kill American soldiers

---

   [1] As discussed more fully below, although the government previously acknowledged in its October 2019 response to the defendant's § 2255 motion that <u>de novo</u> resentencing was appropriate based upon the Second Circuit rule requiring <u>de novo</u> resentencing following vacatur of a count of conviction <u>on appeal</u>, <u>see</u> Gov. Response to § 2255 Mot. (ECF No. 289), at 9 (citing <u>United States v. Powers</u>, 842 F.3d 177, 179 (2d Cir. 2016)), three judges in this District and the Southern District of New York have since held that <u>de novo</u> resentencing following vacatur of a count of conviction is discretionary in the context of motions brought under 28 U.S.C. § 2255.

and others, including foreign government officials, overseas in pursuit of [his] goal of violent jihad," and that he "took substantial steps toward providing . . . material support" to terrorists. Order of February 29, 2012 (ECF No. 260). Judge Gleeson imposed a sentence of 27 years of imprisonment, comprising sentences of 27 years on Count One, 27 years on Count Four, and the statutory maximum sentences of 15 years on each of Counts Two and Three, all to run concurrently. Sentencing Tr. (ECF No. 266). This total custodial sentence of 27 years reflected a downward departure from the Sentencing Guidelines' recommendation of life in prison. Id. The Second Circuit affirmed the defendant's conviction and sentence in all respects. United States v. Kaziu, 559 F. App'x 32 (2d Cir. 2014).

On April 14, 2019, the defendant filed a motion (ECF No. 283) pursuant to 28 U.S.C. § 2255 seeking to vacate his conviction and sentence as to Counts One and Four. The government filed a response (ECF No. 289) opposing the defendant's motion as to Count One, but conceding that the defendant's conviction as to Count Four could not stand because it was premised on crimes of violence that satisfy only the "residual clause" of 18 U.S.C. § 924(c)(3)(B), which the Supreme Court invalidated as unconstitutionally vague in United States v. Davis, 139 S. Ct. 2319 (2019).

The Court has not yet ruled on the defendant's motion, but on October 21, 2019, the Court entered an order scheduling a resentencing proceeding "[b]ased upon the Government's" submission. The defendant filed a reply (ECF No. 293) to the government's opposition on December 4, 2019, and continued to press his argument as to Count One. For the reasons stated in the government's opposition, the Court should reject the defendant's meritless argument as to Count One and deny his motion with respect to that Count, but vacate his conviction as to Count Four.

On March 18, 2020, the defendant filed a memorandum in support of resentencing (ECF No. 300), in which he asked this Court to resentence him to a term of no more than 15 years, with credit for time served. Although the defendant's conviction on Count Four should be vacated, it is clear from the record that the sentence imposed on Count Four was redundant and that its vacatur need not—indeed, should not—shorten the overall sentence. The government respectfully submits that the original sentence of 27 years, which reflected a significant downward departure from the Guidelines range of life imprisonment, and which the Second Circuit affirmed as procedurally and substantively proper, was and is a fair sentence, and that this Court should leave it unaltered. Even if the Court decides to hold a de novo resentencing, it should reject the defendant's request for a 15-year sentence and should impose a sentence that is no shorter than the 27 years that Judge Gleeson imposed specifically on Count One, irrespective of the count now requiring vacatur. See Sentencing Tr. 31; cf. United States v. Mumuni, 946 F.3d 97, 108 (2d Cir. 2019) (vacating as substantively unreasonable a 17-year sentence, which was "shockingly low and unsupportable as a matter of law" as a downward departure from a Guidelines range of 85 years for, inter alia, conspiracy to provide material support to terrorists).

I.    Background and Offense Conduct

The defendant was born in Brooklyn in 1988.  He lived there all his life until February 2009, when he and his friend and co-conspirator flew from John F. Kennedy International Airport ("JFK") to Cairo, Egypt, determined to join a foreign terrorist organization, wage violent jihad, and kill Americans and American allies abroad.  The evidence at trial showed the following:

A.    Kaziu's Radicalization and Travel to Egypt

The defendant's co-conspirator, Cooperating Witness 1 ("CW1"), pleaded guilty to conspiracy to provide material support to terrorists, in violation of 18 U.S.C. § 2339A, and testified at the defendant's trial pursuant to a cooperation agreement.  Trial Tr. 341.  CW1 testified that he and the defendant were neighbors and childhood friends, Trial Tr. 354–56, and that starting in or about 2007, they both started to become more serious about their religious observance.  Trial Tr. 358–59.  Specifically, CW1 testified that both he and the defendant began to observe the "five pillars of Islam" and began to attend a specific mosque in Bensonhurst, Queens.  Trial Tr. 353, 359–60.  CW1 and the defendant began "growing [their] beards and shortening [their] pants and [they] abstain[ed] from sexual activity with women prior to marriage," and stopped "eating pork, [] drinking alcohol and [] clubbing."  Trial Tr. 361.  They met new people at the mosque and began to discuss religion more often.  Trial Tr. 362.  Over time, CW1 and the defendant became radicalized.  Specifically, CW1 testified that in or about 2008, "after watching videos of the situation of what was happening in Afghanistan and Iraq, with the Muslims being humiliated in places like Abu Ghraib Prison [and] Guantanamo Bay, [his] view of America and what it was doing completely changed," as well as his "view of jihad being obligatory upon every Muslim."  Trial Tr. 368–69.  CW1 testified that the defendant's views changed in concert with his own.  Id.

Around that time, CW1 and the defendant had begun watching videos published online by al-Qaeda's media wing As-Sahab, and by the terrorist group al-Shabaab.  Trial Tr. 369.  CW1 testified that he and the defendant would "watch videos of Osama Bin Laden . . . about how America was lying and killing the Muslims in places like Iraq and Afghanistan," and that they would discuss the idea "that the people should stand up and fight" and that "[al-]Qaeda and [the] Taliban [were] right fighting against the oppressors."  Trial Tr. 370–71.

CW1 and the defendant also watched videos of Chechen mujahedeen[2] conducting military training, and one video of the death of a Chechen mujaheed whose "last words [were] 'I bear witness that there is no God but God.'"  Trial Tr. 372–73. CW1 testified that the defendant reacted to this video by indicating that he "liked the way in which the mujaheed [had] died," and that they both saw this as "a beautiful death."  Trial Tr. 373.  They also watched a video lionizing

_____

    [2]  "Mujaheed" (plural "mujahedeen") is Arabic for one who engages in jihad.

"the leader of the [Chechen] rebels," Amir Khattab, as the "sword of Islam." Trial Tr. 374–75; GX 403B (attached as Exhibit A).[3] CW1 testified that he and the defendant "looked up to [Khattab] because [they] believed that he was fighting the oppressors who were the Russians." Trial Tr. 372. The video displayed various shots of Khattab preparing for or participating in battle, overlaying a photograph of Khattab holding a shoulder-mounted rocket, accompanied by a militant jihadist hymn interspersed with the sounds of gunfire and explosions. See Exhibit A. The video repeatedly encouraged the viewer to "confront the infidels, the inhabitants of the hell fire." Id.

CW1 and the defendant watched a video of a speech given by Abu Abdullah in reaction to the alleged desecration of a Koran by an American soldier. Trial Tr. 383. The speech included references to the implementation of Islamic rule, and CW1 testified that, in 2008, he and the defendant supported such Islamic rule. Trial Tr. 385. During the speech, members of the crowd chanted "bomb, bomb USA" and Abu Abdullah described a future world under Shariah law. Trial Tr. 387; GX 933 (attached as Exhibit B). CW1 explained that, under such implementation of Shariah law, "[men or women] who break[] the sanctity of marriage are to be stoned [and those] who drink[ are] to be flogged. [And, a]s far as the Christians and the Jews, [] they have three choices . . . they have the choice to convert to Islam, [they have the choice to] pay jizyah, which is [a] tax or [they have the choice to] be killed." CW1 explained that if Christians or Jews were willing to pay the jizyah, then they would receive "protection, food and shelter." Trial Tr. 384–85. In the video of the speech, Abu Abdullah advocated implementing Shariah law, but removing the option for the Christians and Jews to pay the jizyah. See Exhibit B. CW1 testified that the implementation of Shariah law that Abu Abdullah described and that CW1 and the defendant desired was depicted on a world map that the defendant kept on his computer, which showed that "within the next hundred years the whole world will be under the Islamic Caliphate." Trial Tr. 390–92; GX 701-O (attached as Exhibit C).

CW1 and the defendant had conversations in or about 2008 concerning their belief that "the Zionist Jews were basically killing the Palestinian innocents for their own benefits and that these Zionist Jews were dirty people, that they were pigs." Trial Tr. 400. They watched videos about Somalia disseminated by the terrorist group al-Shabaab and its leader Abu Mansour. CW1 testified that al-Shabaab was fighting with "guns and grenades" and that its goal was to overthrow the government and implement Islamic rule in Somalia. Trial Tr. 401–02. CW1 and the defendant discussed "how the government of Somalia was oppressing the people of Somalia and that [he and the defendant] thought that going there and fighting jihad was the right thing to do." Trial Tr. 401. CW1 and the defendant began to neglect the teachings of senior scholars in Islam and "started accepting people like Osama bin Laden and [the radical cleric] Anwar al-Awlaki and Abu Mansour and Abu Abdullah." Trial Tr. 405. They both adopted the

---

[3] Videos attached as exhibits will be submitted to the Court and defense counsel under separate cover.

teaching that jihad was obligatory for "every single Muslim that was physically able."  Trial Tr. 406.

In and around October and November 2008, the defendant began discussing the prospect of overseas travel for the purpose of joining a terrorist organization and waging jihad. Trial Tr. 412.  CW1 testified that the defendant said he wanted to "go fight jihad with al-Qaeda and the Taliban," Trial Tr. 416, and that the defendant spoke with someone about finding an apartment in Pakistan.  Trial Tr. 414.  Specifically, the defendant told CW1 that after going to Pakistan, he would travel to Waziristan—a known Taliban stronghold in the Federally Administered Tribal Areas on the border of Pakistan and Afghanistan—to join the Taliban, and ultimately would travel to Afghanistan to fight American forces there.  Trial Tr. 417.  The defendant asked CW1 to travel with him to Pakistan, but at first CW1 said he did not have money for the trip and could not go with the defendant.  Id.  They continued to talk about it, however.

In 2008 and 2009, CW1 and the defendant listened to recorded lectures about jihad by Anwar al-Awlaki.[4]  Trial Tr. 392–98.  CW1 testified that these lectures provided advice for waging jihad overseas, and "basically made it simpler for [them] to leave, making it easier for [them] to leave because [they] knew that by leaving [they were] doing a greater cause for the religion and for [them]selves."  Trial Tr. 393–94.  CW1 testified that the lectures pushed him and the defendant to go to Cairo first, but that they wanted to go from there to Afghanistan, Pakistan, Somalia or Iraq "to fight and die in jihad."  Trial Tr. 394.

In December 2008 and January 2009, the defendant and CW1 took additional steps to act on their radicalized beliefs.  They spoke with a friend who had ties with Egypt and asked him for help finding an apartment in Cairo.  Trial Tr. 418–19.  They sent money to a contact of their friend to find an apartment for them.  Trial Tr. 419.  CW1 obtained a new birth certificate and passport.  Trial Tr. 419–20.  The defendant purchased plane tickets for himself and CW1, as well as a laptop computer.  Trial Tr. 420.  Then, in February 2009, the two men went to JFK, boarded an international flight, and flew to Cairo, with intent to "make hijrah"[5] and never come back to the United States.  Their plans were to study Arabic and wage jihad. Trial Tr. 406, 420–21.

---

[4] Anwar al-Awlaki was a U.S.-born radical Islamic cleric and prominent leader of al-Qaeda in the Arabian Peninsula (AQAP), who, even today, nearly 10 years after his death, is still commonly regarded as the leading figure inciting English-speaking Muslims to participate in violent jihad.

[5] "Hijrah" is Arabic for "departure" or "migration."

B. Kaziu's Efforts in Cairo to Prepare for Jihad

The defendant and CW1 chose Cairo as their first stop because it was close to some of the areas where they wanted to fight. Trial Tr. 424. When they arrived in Cairo, they found an apartment in Nasir City and enrolled in the El Fajr Institute to study Arabic. Trial Tr. 424–25. They continued to discuss plans for waging jihad, and when they talked about going to fight in Chechnya, Somalia, Iraq, Afghanistan, Pakistan, and Israel, they attempted to conceal their discussions by removing the batteries and SIM cards from their phones to avoid the possibility of interception. Trial Tr. 427.

The defendant by this time identified as a mujaheed. He used as a social media "avatar" an illustration of a mujaheed in a black turban, combat boots and vest, and camouflage pants, carrying a scimitar and a black flag with the words "To the brothers & sisters who live, love and fight In the Name of Allah." Trial Tr. 478, 636; GX 701-L (attached as Exhibit D). His YouTube account was registered under the username "soldierofjihad." Trial Tr. 644–45. He kept on his computer a flag-like image with a black background and white print depicting the Arabic text of the Shahada,[6] a silhouette of an AK-47, and the English words "Support Our Troops." Trial Tr. 478–80; GX 701-K (attached as Exhibit E). CW1 testified that he understood the "Troops" in this image to be a reference to mujahedeen. Trial Tr. 480. The defendant and CW1 discussed the doctrinal permissibility of suicide attacks generally, and of the September 11 terrorist attacks in particular, and the defendant told CW1 that "because of what America was doing to the Muslims, that under these circumstances, that what happened on September 11th by those people killing themselves was permissible." Trial Tr. 484–85.

The defendant and CW1 met with people in Egypt to facilitate their desire to wage jihad. One such individual was "Ahmed," a Somali who had previously lived in the United Kingdom, and who agreed to help connect them with al-Shabaab and to wage jihad in Somalia. Trial Tr. 431–32. The defendant and CW1 made plans to contact Ahmed's cousin, fly to Kenya, and travel to the border between Kenya and Somalia, where Ahmed's cousin would pick them up and drive them to Mogadishu. Trial Tr. 445. CW1 testified that he and the defendant also discussed the prospect of traveling on a route through Djibouti, Trial Tr. 446, or shaving their beards to look less suspicious and traveling to Kenya as tourists in an effort to reach Somalia. Trial Tr. 448. CW1 testified that it was his clear understanding, at the time he and the defendant were attempting to travel to Somalia to join al-Shabaab, that al-Shabaab sought to overthrow the Somali government and implement Shariah law, using weapons such as AK-47s and RPGs to kill Somali troops, and to sabotage government buildings with bombs. Trial Tr. 449. CW1 testified that the defendant told him that he wanted "to fight and die in jihad" in Somalia, and that CW1 himself expected to die in Somalia while fighting there. Trial Tr. 462–63.

---

[6] The "Shahada" is an Islamic creed that means "There is no god but God. Muhammad is the messenger of God." It is often displayed on Islamic flags.

The defendant and CW1 also met Armend Kalanderi, who referred them to an associate who would help them get to Pakistan to join al-Qaeda and the Taliban.  Trial Tr. 429–30.  Their plan in Pakistan was to "go to Waziristan and join up with Taliban and Al Qaeda and when there [to] receive both physical and combat training . . . with guns . . . [and] ultimately from there going to Afghanistan and fighting jihad against . . . U.S. troops and its allies."  Trial Tr. 430–31.  CW1 testified about a series of meetings that he and the defendant had with Kalanderi during which they discussed ways Kalanderi could help them travel to Pakistan to fight jihad.  Trial Tr. 464–72.  The defendant told CW1 that he wanted to go to Pakistan, join al-Qaeda and the Taliban, receive training, and fight jihad in Afghanistan against the United States and its allies.  Trial Tr. 473.  CW1 testified that he and the defendant intended to kill American soldiers and to fight using weapons including AK-47s, M-4s, M-16s, RPGs and grenades, and that they expected that they might be killed by American soldiers.  Id.  The defendant and CW1 also attempted to find firearms on the black market in Cairo.  They sought "assault rifles primarily, like AK-47s," to use in the event that "some type of war, some type of revolution" broke out in Egypt.  Trial Tr. 488.

In May 2009, the defendant sent an email to an associate and told him that the Egyptian army was arresting people in the defendant's neighborhood, and he asked the associate to communicate with the defendant's family if he should disappear.  In the email, the defendant asked "[Allah] to not test us with more than we can bear," to "keep[] us firm," "forgive our sins," and "to grant us the best of deaths."  The defendant asked his associate to "[t]ell [his] parents that when this occurred [he] wasn't afraid, and that Allah, he tests his servants, and tells them to fear Allah because they are not safe from any calamity except by his will," that they would meet again in jannah.[7]  Trial Tr. 841–43; GX 307 (attached as Exhibit F).

    Shortly thereafter, President Barack Obama visited Cairo and gave a speech, which the defendant discussed with CW1.  Trial Tr. 490–91, 494.  CW1 testified that it was around the time of the speech that CW1 began to change his mind about going to fight jihad, and after watching the speech he "was hopeful for the relationship between the Islamic world and the U[nited] S[tates]."  Trial Tr. 494.  CW1 told the defendant that he felt this way, and the defendant chastised him and told him not to be fooled by President Obama's speech, which in the defendant's view was "like throwing sand in your eyes, just to blind you from the truth."  Trial Tr. 494.  CW1 decided to return to the United States, but he attempted to hide this intention from the defendant, because he believed the defendant "would get angry."  Trial Tr. 502–03.  Indeed, the defendant eventually found out and confronted CW1, and the defendant said, "why are you going back to the disbelieving lands?  What about our plans to fight [jihad]?"  Trial Tr. 504.  The defendant tried to convince CW1 to go with him to fight in the Balkans against troops stationed there as part of a North Atlantic Treaty Alliance ("NATO") mission. Trial Tr. 504–05.  CW1 left Cairo to visit family in Montenegro, and to continue on to the United States later, but

---

[7]  "Jannah" is the Islamic paradise in the afterlife.

he stayed in contact with the defendant by email.  Trial Tr. 505–06.  The defendant continued to send emails asking CW1 why he was going back to the United States, asking him not to go back, and asking him about their plans to fight jihad.  Trial Tr. 506.

C.  Kaziu's Move to Kosovo

In July 2009, after CW1 had left Egypt and rejected the defendant's requests that he accompany the defendant to the Balkans to wage jihad against NATO forces, the defendant traveled to the Balkans himself and took up residence in a small apartment in Prizren, Kosovo. That apartment was about an hour by car from a United States military installation known as Camp Bondsteel.  Trial Tr. 288–89.

On August 5, 2009, the defendant wrote in an email to CW1: "It has been authentically narrated from our messenger . . . [t]he best martyrs are those who fight in the first line.  Not turning around until they are killed."  Trial Tr. 837; GX 301 (attached as Exhibit G). On August 24, 2009, the defendant sent an email with the following poem, signed with the defendant's own name:

> They say he who believes in Allah is a terrorist,
> He who when the call to Jihad is made doesn't snore.
> Sharp is his spear.
> He's ready to strike.
> For the hur al-ayn he will delight.[8]
> In the green birds his soul will fly.
> In jannah with wine and thrones raised high.
> In front of Allah leaking in blood he will be asked why.
> For you my rubb I wanted to die.[9]
>     Betim Kaziu

Trial Tr. 838; GX 304 (attached as Exhibit H).

On or about August 25, 2009, the FBI alerted authorities in Kosovo of the possibility that the defendant was engaged in a terrorist plot.  Shortly thereafter, Kosovar law enforcement executed search warrants at the defendant's Prizren apartment and at the home of an associate of the defendant whom the defendant had recently visited.  Among other things, the Kosovar authorities recovered the defendant's computer and digital camera, identification and travel documents, and a firearms catalog.  Trial Tr. 273–80, 285–86, 818–20.  The defendant had recorded several videos, which were recovered from his digital camera.  In one of the videos, an image of the Statue of Liberty is superimposed over the faces of the defendant and a young

---

[8]  "Hur al-ayn" in Islamic eschatology are women who will accompany faithful believers in paradise.

[9]  "Rubb" (or "rabb") is Arabic for "lord" or "sustainer."

friend in Kosovo while the two of them use their hands jokingly as airplanes flying into the Statue, and the defendant's friend says "Oh God, oh God, Statue of Liberty down!" as the defendant smiles and laughs.[10]  (Attached as Exhibit I).  In another of the videos—a martyrdom video—the defendant was apparently on the Albanian coast near Kosovo, speaking into the camera, and he referred to departing soon to jannah: "And, [God willing] these my last few moments before I go, [God willing] to jannah [God willing if Allah, for Allah's sake] if Allah wants.  So I didn't choose to come here.  To me, if I just come here for no reason it's a waste of time, but I came with the brothers to chill before I [God willing] before I depart."  GX 701-C (attached as Exhibit J).

After the defendant was arrested and transferred to FBI custody, he waived his Miranda rights and consented to an interview.  He said that he had moved to Kosovo in July and planned to travel to Macedonia and then to Pakistan on September 15, 2009, and that he had already purchased tickets to Pakistan from a travel agency in Kosovo.  He also admitted to handling a gun while in Kosovo, and he drew a sketch of the gun for his interviewer.  Trial Tr. 315–21.

### D. Conviction and Original Sentencing

On July 7, 2011, the defendant was convicted at trial on all four counts with which he had been charged: Conspiracy to Commit Murder in a Foreign Country, in violation of 18 U.S.C. § 956 (Count One), Conspiracy to Provide Material Support to Terrorists, in violation of 18 U.S.C. § 2339A (Count Two), Attempt to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B (Count Three), and Conspiracy to Use a Firearm, in violation of 18 U.S.C. § 924(o) (Count Four).  The applicability of the terrorism enhancement under § 3A1.4 of the Sentencing Guidelines was uncontested, see Defendant's Sentencing Mem. at 7–14 (ECF No. 256),[11] and the resulting Guidelines range was life in prison.

At sentencing, the defendant took the opportunity to address Judge Gleeson, and he principally denied culpability on the basis that "although [he] had certain beliefs or thoughts [he] never reached the point of committing any violent act of terrorism."  Sentencing Tr. 12.  He also blamed his lawyers who, in his view, "weren't able to defend [him] appropriately."  Id. Finally, he expressed a wish that he "never went down this path" and said that he "regret[ted] what [he] did in that phase of [his] life."  Sentencing Tr. 14.

---

[10]  The defendant and this friend also recorded other videos, generally of a playful character and not relating to jihad.  In part for that reason, Judge Gleeson found this "Statue of Liberty Down" video to be more prejudicial than probative and it was not admitted as evidence at trial.

[11] The defendant also conceded the applicability of the terrorism enhancement on appeal. See United States v. Kaziu, 559 F. App'x 32, 39 (2d Cir. 2014).

Judge Gleeson observed that "[f]rom the moment [the defendant was] arrested there was good reason to believe [he was] ready and willing and able to kill in the name of jihad and, indeed, that [he] had decided to do just that." Sentencing Tr. 22. Judge Gleeson noted that the defendant had not been arrested because of his extremist political views or his hatred of his own country, but "because [he] decided to kill in furtherance of those beliefs and the evidence, that included [his] martyrdom video and farewell messages, shows that [he] came pretty close to doing that." Id. With reference to the defendant's statements that day, the judge said that it "was painfully clear to everyone" that "[t]here was no hint of [remorse] until [he] spoke." Sentencing Tr. 27. Judge Gleeson said that he "d[id]n't completely accept as genuine what [the defendant] said," and he was "afraid it's opportunistic." Sentencing Tr. 28–29. Judge Gleeson said:

> If you walked out the door right now, I have no reason to doubt at all, notwithstanding what you just said, that you'd try to pick up where you left off, maybe succeed this time. I really don't think that your resolve to commit terrorist acts has been diminished by 29 months in the MCC. It still leaves the question of when will it, will it ever?
>
> You present yourself to me today as a young man who committed a deadly serious crime, who remains largely unrepentant. You still protest your innocence, you have a right to do that, but I have an obligation based on the facts before me to make my own fact finding, my own conclusions on which I'm basing your sentence, and I don't believe you.
>
> I think your guilt was proved overwhelmingly, notwithstanding the excellent defense you got. My unhappy task today is to hold you accountable for the crimes you committed, which in and of itself requires punishment commensurate with the seriousness of those crimes, and crimes don't get a whole lot more serious than the ones you committed.
>
> * * *
>
> At bottom, I believe that you're still way too proud of having become a jihadist.

Sentencing Tr. 29–30.

Judge Gleeson considered the 3553(a) factors and, departing downward from the Guidelines, imposed a sentence of 27 years of imprisonment on each of Counts One and Four, and the statutory maximum sentence of 15 years of imprisonment on each of Counts Two and Three, all to run concurrently, to be followed by a life term of supervised release.

E.  Kaziu's Conduct During Incarceration

In 2013, the defendant earned a GED while in the custody of the Bureau of Prisons.  Since then, he has also participated in courses on health and fitness, culinary arts, and Arabic.

The defendant's disciplinary history records two infractions.  In 2011, he was sanctioned for interfering with a count of inmates, and he lost telephone privileges for three months.  In 2012, the defendant was involved in a dispute with another inmate over the alleged theft of the defendant's watch, several other inmates were drawn into the dispute, and it resulted in a multi-person fight.  During this fight, the defendant punched the inmate whom he accused of theft, and when that inmate was on the ground, the defendant kicked him in the head.  The penalty for this assault was disallowance of 27 days of "good conduct time," forfeiture of 60 days of non-vested good conduct time, 60 days of disciplinary segregation, and eight months of lost telephone and visitation privileges.

II.    Applicable Law

A.  Scope of Relief

Although de novo resentencing is the default rule when a count of conviction is vacated on appeal, three courts in the last year have held that de novo resentencing is discretionary when a count of conviction is vacated through a collateral attack.

The Second Circuit has held that when a count of conviction (or any fewer than all counts of conviction) is vacated, the "'default rule' to remedy [this] so-called 'conviction error'—as distinct from a so-called 'sentencing error'—is de novo resentencing."  United States v. Powers, 842 F.3d 179 (2d Cir. 2016).[12]  "That process need not be overly cumbersome," id. at 181 n.10, because although the Second Circuit has prohibited district courts "from automatically imposing the same sentence" in such cases, United States v. Desnoyers, 708 F.3d 378, 387 (2d Cir. 2013) (emphasis in original), it has not prohibited them from "exercising discretion [and] decid[ing] to impose the same sentence" after consideration of the new constellation of counts of conviction and the calculation of the Guidelines range, id.  In short, "a district court that is required to resentence de novo must reconsider the sentences imposed on each count, as well as the aggregate sentence."  United States v. Rigas, 583 F.3d 108, 118 (2d Cir. 2009).  The court "should determine whether the change in the constellation of offenses of conviction has altered the factual mosaic related to those offenses," and "[i]f the court determines that the factual mosaic related to a count of conviction has not been altered, no further proceeding as to that

---

[12] By contrast, resentencing following sentencing error is generally limited to the narrow issue that produced the error, unless correcting it "effectively undoes the entire 'knot of calculation.'"  United States v. Quintieri, 306 F.3d 1217, 1228 (2d Cir. 2002).

count is necessary, except to the extent it affects the aggregate sentence." Id. at 118–19 (internal quotation marks and modifications removed).

At least three district courts in the Second Circuit have recently held that this "default rule" of de novo resentencing following vacatur of a conviction does not apply to vacatur of a count of conviction by the district court itself pursuant to a motion under 28 U.S.C. § 2255. See United States v. Pena, No. 09-CR-341 (VM), 2020 WL 7408992, at *6 (S.D.N.Y. Dec. 17, 2020) (vacating conviction and sentence for three § 924(c) and (j) offenses, but denying request for resentencing and leaving undisturbed the sentences on remaining counts of conviction); United States v. Medunjanin, No. 10-CR-0019 (BMC), 2020 WL 5912323, at *8 (E.D.N.Y. Oct. 6, 2020) (vacating conviction and sentence for one § 924(c) offense, but denying request for resentencing and leaving undisturbed the sentences on remaining counts of conviction); Ayyad v. United States, No. 16-CV-4346 (LAK), 2020 WL 5018163, at *2 (S.D.N.Y. Aug. 24, 2020) (same). As the Second Circuit has explained, the default rule applies when "the conviction on one or more charges is overturned on appeal and the case is remanded for resentencing." United States v. Quintieri, 306 F.3d 1217, 1227–28 (2d Cir. 2002) (emphasis added). The § 2255 context differs from remand following appeal in important respects, including the "narrow scope" of § 2255 and more limited availability of relief under that statute, which "reflects an interest in the finality of a criminal judgment . . . that is not present on direct appeal." Medunjanin, 2020 WL 5912323, at *8. Additionally, "the plain text of § 2255 vests the Court with the discretion to determine first the nature of the relief that 'may appear appropriate.'" Id. (quoting 28 U.S.C. § 2255(b)). Accordingly, Judge Cogan held that a district court that grants the relief of vacatur of a count of conviction pursuant to a motion filed under § 2255 "ha[s] discretion to hold a de novo resentencing . . . if appropriate but [is] not required to do so." Id.

For the reasons set forth below, the government respectfully submits that no de novo resentencing is warranted in this case.

B. Sentencing Procedure

If Your Honor decides to conduct a de novo resentencing, it is settled law that the Court "should begin . . . by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2) the need for the sentence imposed--

 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

 (B) to afford adequate deterrence to criminal conduct; [and]

 (C) to protect the public from further crimes of the defendant.

Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation. See 18 U.S.C. § 3553(a)(2)(D). Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence. The district court must also "remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 50 n.6.

III. Analysis

A. The Court Should Vacate Count Four Without De Novo Resentencing

The government agrees that the Supreme Court's decision in United States v. Davis, 139 S. Ct. 2319 (2019), compels the vacatur of the defendant's conviction on Count Four. For the reasons stated in the government's response to the defendant's § 2255 petition, however, the defendant's arguments with respect to Count One are meritless. In short, Davis and its predecessor cases (that is, Johnson v. United States, 135 S. Ct. 2551 (2015), and Sessions v. Dimaya, 138 S. Ct. 1204, 1213 (2018)) have nothing whatsoever to say about convictions under 18 U.S.C. § 956(a). Those cases are about statutes with residual clauses that require categorical determinations of whether other offenses constitute "violent felonies" or "crimes of violence." By contrast, § 956(a) has neither a "crime of violence" element nor a residual clause of any sort.

Accordingly, the only "change in the constellation of offenses of conviction," Rigas, 583 F.3d at 118, is in this case the vacatur of a single count of Conspiracy to Use a Firearm, in violation of 18 U.S.C. § 924(o). Vacatur of that count has no effect whatsoever on the defendant's sentence. Indeed, Judge Gleeson expressly imposed a sentence of 27 years on both Count One and Count Four, and the 15-year statutory maximum on Count Two and Count Three, with "[a]ll of [these] terms of imprisonment . . . to run concurrent with one another." Sentencing Tr. 31; see also Judgment at 2 (ECF No. 263) ("The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of: Count One: twenty-seven (27) years of incarceration; Count Two: fifteen (15) years of incarceration; Count Three: fifteen (15) years of incarceration; Count Four: twenty-seven (27) years of incarceration. The term of incarceration is to run concurrently on all four counts totaling twenty-seven (27) years."). Thus, the vacatur of Count Four and the concurrent 27-year sentence imposed on it is a merely ministerial act, given that the defendant remains subject to a 27-year term of imprisonment on Count One. In light of the broad discretion vested in the Court by § 2255 "to determine first the nature of the relief that 'may appear appropriate,'" Medunjanin,

2020 WL 5912323, at *8 (quoting 28 U.S.C. § 2255(b)), the Court can and should simply order the judgment amended while leaving the concurrent sentences imposed on Counts One, Two, and Three unaltered.

> B.    <u>If the Court Elects to Resentence Kaziu, It Should Impose the Same Sentence on the Remaining Counts that Judge Gleeson Imposed on Them</u>

Even if the Court chooses to hold a <u>de novo</u> resentencing, the Guidelines calculation is exactly the same now as it was at the defendant's original sentencing, and the same analysis applies. The "factual mosaic" related to the remaining counts of conviction has not been altered, <u>Rigas</u>, 583 F.3d at 118, and the same sentence should be imposed.

As an initial matter, "the starting point and the initial benchmark" of sentencing is necessarily the Guidelines, <u>Gall</u>, 552 U.S. at 49, and the Guidelines call for life in prison. Indeed, as calculated and described below, the defendant's adjusted offense level of 45 is literally off the chart, and would correspond to a Guidelines sentence of life imprisonment regardless of the defendant's criminal history category and the application of Section 3A1.4(b), which places the defendant into the most serious criminal history category. The government did not contend at the defendant's initial sentencing and does not now contend that a life sentence is the only reasonable sentence in this case, but the defendant has already benefited from a substantial reduction from the Guidelines. Given the abhorrent nature of the defendant's criminal conduct, his lack of appreciation for the serious nature of that conduct, and the need for adequate deterrence, a further reduction would not be appropriate.

> 1.    <u>The Terrorism Enhancement Applies</u>

The terrorism enhancement at § 3A1.4 of the Sentencing Guidelines provides, in subsection (a), for a 12-point increase to the adjusted offense level; and, in subsection (b), for a criminal history increase to category VI. It is applicable to any felony offense "that involved, or was intended to promote, a federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g)(5). <u>See</u> U.S.S.G. § 3A1.4 at comment n.1. That statutory provision, in turn, defines "federal crime of terrorism" as a violation of any statute among a list—which includes all three counts of conviction here—if the violation was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

In this case, the evidence presented at trial established that the defendant's criminal conduct was "calculated to influence or affect . . . or to retaliate against" the United States and Somali governments. Indeed, the defendant's attempts to join al-Qaeda, the Taliban and al-Shabaab were accompanied by plans to kill U.S. soldiers in Afghanistan or Kosovo and foreign government officials in Somalia.[13] The terrorism enhancement is therefore appropriately

---

[13]    Additionally, the Second Circuit has held that application of the terrorism enhancement does not require "proof of a defendant's particular motive." <u>United States v. Awan</u>, 607 F.3d 306, 317 (2d. Cir. 2010). Rather, the enhancement can apply "even if

applied here.  Indeed, at his original sentencing and on direct appeal, the defendant conceded that the terrorism enhancement applies.  See Defendant's Sentencing Mem. at 7–14 (ECF No. 256); United States v. Kaziu, 559 F. App'x 32, 39 (2d Cir. 2014) ("Kaziu admits that he was found guilty of a 'federal crime of terrorism' . . . .").

Now, however, the defendant objects to the application of the terrorism enhancement and argues that § 3A1.4 is unconstitutional because it is "both vague and categorical" under Johnson, Dimaya, and Davis.  See Defendant's Resentencing Memorandum at 19–27 ("Def. Mem.") (ECF No. 300).  Like the similar contention the defendant raised in his § 2255 petition concerning his conviction on Count One, this argument is meritless.  Those cases simply have nothing to say about the terrorism enhancement—which is consistent with the fact that several courts within this district have applied the enhancement even since Davis was decided in 2019 without expressing any concern that it was called into doubt by this line of cases.  Moreover, the Supreme Court held in Beckles v. United States, 137 S. Ct. 886 (2017), that the Sentencing Guidelines are not subject to constitutional vagueness challenge.  Accordingly, the defendant's constitutional argument should be rejected and the terrorism enhancement applied.

     i.   Johnson, Dimaya, and Davis Do Not Bear on the Terrorism Enhancement

The Supreme Court in Johnson addressed the so-called "residual clause" in the Armed Career Criminal Act (ACCA).  The ACCA subjects defendants who are convicted of possessing a firearm as a previously convicted felon to more severe penalties if they have three or more previous convictions for violent felonies.  The statute's definition of "violent felony" includes a residual clause that captures any felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B).  The application of this residual clause to particular prior convictions required judges to use the "categorical approach" to imagine the "ordinary case" of a crime and evaluate whether it satisfied the "imprecise 'serious potential risk' standard."  135 S. Ct. at 2558.  The Supreme Court held that the residual clause was unconstitutionally vague because it "combin[ed] indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony."  Id.

In Dimaya, the Court examined a separate but similar residual clause in 18 U.S.C. § 16(b), which many federal criminal provisions use to define "crime of violence."  This residual clause captured any felony that "by its nature, involves a substantial risk that physical force

---

influencing or retaliating against government is not [the defendant's] personal motivation."  Id. By way of example, "a person who murders a head of state" commits an act that satisfies the statutory definition of terrorism if he knows "that his crime will influence or affect the conduct of government . . . even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities."  Id. (emphasis in original).

against the person or property of another may be used in the course of committing the offense." The <u>Dimaya</u> Court held that a "straightforward application" of <u>Johnson</u> resolved the case, because "§ 16's residual clause has the same two features as ACCA's, combined in the same constitutionally problematic way." 138 S. Ct. at 1213. Specifically, the clause "calls for a court to identify a crime's 'ordinary case' in order to measure the crime's risk," and also poses "uncertainty about the level of risk that makes a crime 'violent.'" <u>Id.</u> at 1215. The Court therefore held that this residual clause, too, is unconstitutionally vague.

In <u>Davis</u>, the Court applied <u>Johnson</u> and <u>Dimaya</u> to 18 U.S.C. § 924(c), which imposes more severe penalties for certain other federal crimes if committed with a firearm. As for <u>which</u> other federal crimes, the residual clause at § 924(c)(3)(B) points to violent crimes using materially identical language as the residual clause addressed by the Court in <u>Dimaya</u>. The Court summarized the holdings of <u>Johnson</u> and <u>Dimaya</u> as "teach[ing] that the imposition of criminal punishment can't be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined 'ordinary case.'" 139 S. Ct. at 2326. This residual clause, too, was thus rendered unconstitutional.[14]

All three of these cases—<u>Johnson</u>, <u>Dimaya</u>, and <u>Davis</u>—concern residual clauses within certain definitions of violent crimes that sweep into these definitions any prior offense the commission of which would require some imprecise threshold risk of force (a "serious potential risk" in <u>Johnson</u> and a "substantial risk" in <u>Dimaya</u> and <u>Davis</u>) in a judicially imagined "ordinary case."

Those cases, and their attendant definitions, bear no resemblance to the terrorism enhancement at § 3A1.4 of the Sentencing Guidelines, nor to the statutory definition of terrorism that it incorporates by reference. On the contrary, the terrorism enhancement applies at sentencing if the defendant is convicted of violating or promoting the violation of any statute among a specific list (all three valid counts of conviction here qualify) and, under the facts of the <u>particular</u> case (not a judicially imagined "ordinary case") the violation was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Thus, the terrorism enhancement involves <u>no</u> residual clause, <u>no</u> judicial imagination of an "ordinary case," and <u>no</u> imprecise threshold degree of risk (or of anything else). It is not vague at all, let alone unconstitutionally vague, and it does not contradict any principle in <u>Johnson</u>, <u>Dimaya</u>, or <u>Davis</u>.[15] It is therefore no surprise that several courts within

---

[14]  Kaziu's conviction on Count Four was under 18 U.S.C. § 924, and—unlike his convictions on Counts One, Two, and Three—was reliant on this section's residual clause. This is the basis of the government's agreement that Count Four must be vacated.

[15]  The defendant argues that the terrorism enhancement is unconstitutional because it is both vague and "categorical," <u>e.g.</u> Def. Mem. at 19, but the import of "categorical" in his formulation is unclear. He seems to be alluding to the use of the "categorical approach" that was implicated in <u>Johnson</u>, <u>Dimaya</u>, and <u>Davis</u>, by which courts examine offenses of conviction categorically rather than by the actual underlying conduct. <u>See generally</u> <u>Taylor v. United</u>

this district have applied it since Davis was decided without expressing any reservations that it could implicate Johnson and its progeny or the particular concerns that animated those cases. See, e.g., United States v. Al-Farekh, No. 18-943-cr, 810 Fed. Appx. 21, 27 (2d Cir. Apr. 16, 2020) (summary order) (affirming substantive reasonableness of 45-year sentence where district court's determination of the Sentencing Guidelines range included the application of the terrorism enhancement); United States v. Rakhmatov, No. 15-CR-95 (WFK) (E.D.N.Y. Jan. 14, 2021) (applying terrorism enhancement for defendant convicted of conspiring to provide material support to ISIS); United States v. Siddiqui, No, 15-CR-213 (SJ) (E.D.N.Y. Jan. 9, 2020) (applying terrorism enhancement for defendant convicted of  teaching and distributing information pertaining to the making and use of an explosive, destructive device, and weapon of mass destruction, intending that it be used to commit a federal crime of violence).  In none of these post-Davis cases was there any suggestion that the Johnson line of case law somehow invalidated the terrorism enhancement.  In short, the validity of the terrorism enhancement is simply not affected by Johnson or its progeny, and it is clearly applicable in this case, as the defendant admitted at his original sentencing and on direct appeal to the Second Circuit.

        ii.   The Guidelines Are Not Subject to Constitutional Vagueness Challenge

Moreover, even if the terrorism enhancement did rely on a residual clause that suffered the infirmities of the residual clauses at issue in Johnson and its progeny (which it does not), it would not be rendered unconstitutionally vague, because the Supreme Court has squarely held that "the advisory Guidelines are not subject to vagueness challenges under the Due Process Clause."  Beckles v. United States, 137 S. Ct. 886, 890 (2017).  The defendant concedes this, as he must, but he emphasizes that "only five" justices agreed in Beckles, that they constituted "the leanest of majorities," and that the majority's analysis "is problematic and may well have limited application because it is based on a flawed generalization."  Def. Mem. at 23–24.  But the defendant cannot contest that the leanest majority is the majority, and that five votes are sufficient to speak for the Supreme Court.

Instead, the defendant argues that Justice Kennedy's short concurring opinion leaves open the possibility that some other constitutional challenge to "vague" definitions in the Guidelines may be possible, but Justice Kennedy's concurrence does not explicate that hypothetical challenge, nor does the defendant.  And importantly, Justice Kennedy joined the Beckles majority in full—not in the judgment only, as Justices Ginsburg and Sotomayor did— and the Kennedy concurrence therefore does not limit the Beckles majority.  Thus, it is clear that

---

States, 495 U.S. 575 (1990) (describing the categorical approach).  But that approach does not apply to the application of the terrorism enhancement here, where the defendant's actual conduct is at issue.

Beckles absolutely forecloses the defendant's constitutional vagueness challenge to the terrorism enhancement.

### iii.    The Defendant's Other Arguments Were Already Rejected by the Second Circuit on Direct Appeal

The defendant argues that even if his constitutional argument against the terrorism enhancement fails—as it must, for the reasons above—the enhancement should not be applied because its impact is disproportionate to his conduct and the actual facts of his criminal history. These are versions of the same arguments he made at his original sentencing and on direct appeal, which were rightly rejected first by Judge Gleeson and again by the Second Circuit.

Specifically, on appeal, while conceding that his conduct fell within the terrorism enhancement, the defendant argued that the terrorism enhancement "was inherently unreasonable" and therefore resulted in a procedurally unreasonable sentence "because automatic placement into the harshest Criminal History Category 'diverge[s] sharply from the true facts' about him"; and "that his 27-year sentence, a downward departure from the Guidelines' recommendation of life in prison, was substantively unreasonable because his crimes 'were essentially ones of evil thought' that did not cause tangible harm." 559 F. App'x at 39. The Second Circuit rejected those arguments, holding that the fact "[t]hat Kaziu did not achieve his murderous objectives—instead, according to the district court, coming 'pretty close' to them— does not render his below-Guidelines sentence unreasonable as a matter of law." Id. at 40 (internal citation omitted). The defendant offers no reason why this court should depart from what Judge Gleeson and the Second Circuit already held when they applied the terrorism enhancement.

### 2.    Guidelines Calculation

The correct Guidelines calculation for the defendant's resentencing, after vacatur of his conviction on Count Four, is the same as the Guidelines calculation that applied at his original sentencing. The defendant's adjusted offense level is predicated on the greater of the adjusted offense levels for each of the charged counts, pursuant to Section 3D1.4 of the Guidelines, and the greater of the adjusted offense levels is the adjusted offense level for Count One, now as before.

Accordingly, as set forth in the PSR, the defendant's total adjusted offense level for Counts One through Three is 45. PSR ¶¶ 25–51. The Guidelines for Count One are calculated as follows:

| | |
|---|---|
| Base Offense Level: (2A1.5) | 33 |
| Plus: Terrorism Enhancement (3A1.4(a)) | +12 |
| Adjusted Offense Level: | 45 |

The defendant is not entitled to an adjustment for acceptance of responsibility pursuant to § 3E1.1. Additionally, pursuant to Guidelines § 3A1.4(b), the defendant's criminal history category is VI. Category VI provides for an applicable advisory Guidelines sentence of life imprisonment. Notably, even if the Court were to accept the defendant's argument that the effect of § 3A1.4(b) unfairly overstates the defendant's actual criminal history and declined to apply it, the applicable Guideline sentence for an adjusted offense level of 45 would still be a sentence of life imprisonment, even at criminal history category I.

3.  The Guidelines Appropriately Account for the Defendant's Conduct

The Sentencing Guidelines treat terrorism offenses severely and thus provide an appropriate touchstone from which to begin the 3553(a) analysis. As the Second Circuit has observed, "the Guidelines signal that any crime promoting terrorism is to be viewed as extremely serious." United States v. Stewart, 597 F.3d 514, 521 (2d Cir. 2010). Likewise, "the strong need to deter terrorism is evident from the Guidelines recommendation that a terrorism defendant be accorded a criminal history of VI, the highest level possible, without regard to [a defendant's] actual criminal record." Id.

"Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under §3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." United States v. Meskini, 319 F.3d 88, 92 (2d. Cir. 2003). Indeed, "[c]onsidering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level." Id.

The present case illustrates the need for such serious treatment. The defendant plotted to join terrorists and to kill United States soldiers in Afghanistan or acting as NATO peacekeepers in Kosovo. He plotted to join terrorists to kill Somali government officials in Somalia. The defendant sought to join three of the world's most dangerous organizations, each of which professes to be at war with the United States: al-Qaeda, al-Shabaab and the Taliban. He took substantial steps to carry out those goals. As Judge Gleeson indicated at the defendant's original sentencing, he nearly completed his plans and was stopped only by the substantial efforts of the United States and Kosovo governments. A sentencing Guideline that presumes a sentence of life in prison for this defendant is well within the bounds of reason, and the 27-year sentence imposed by Judge Gleeson, which reflected a substantial downward departure from the Guidelines, remains appropriate.

4.  The Defendant's Purported Expert Affidavit Should Be Given No Weight

The defendant submits a purported expert affidavit by Dr. Yasir Qadhi, an Islamic cleric who had a conversation with the defendant in prison and concluded that the defendant has

reformed ("Qadhi Aff.").[16]  While Dr. Qadhi may have expertise and be qualified to opine as an expert on matters of Islamic theology, he is not a forensic psychologist, and he has no special ability to evaluate the sincerity of the defendant's assertions of reform.  Moreover, several of his opinions and assertions of fact about radicalization are contradicted by qualified expert opinion, as described in the Declaration of Dr. Lorenzo Vidino, attached as Exhibit K ("Vidino Aff.").  Although courts have flexibility to consider at sentencing evidence that would not be admissible at trial, Dr. Qadhi's opinion lacks indicia of reliability and bears no probative value.  Accordingly, it should not be considered.[17]

The third paragraph of Dr. Qadhi's affidavit cites a 2011 article about him in The New York Times Magazine.[18]  That article provides at least one powerful reason to doubt the reliability of Dr. Qadhi's ability to identify individuals who pose a risk of extremist violence: Umar Farouk Abdulmutallab, who on Christmas Day 2009 tried to blow up a commercial airliner headed for Detroit using explosives hidden in his underwear, and who "had been a student of Qadhi's at the AlMaghrib Institute."  Dr. Vidino points out that "[i]n the aftermath of Abdulmutallab's attack, Dr. Qadhi gave several interviews to the media and in one to CNN he said: 'At some level, we did not convince [Abdulmutallab] of the validity of our views, and that is cause for regret.'"  Vidino Aff. ¶ 9.  Indeed, CNN reported that "Qadhi says there was no indication Abdul[m]utallab in 2008 was extreme in his views."[19]

The article that Dr. Qadhi cites also notes that, in addition to Abdulmutallab, other "former students of Qadhi's institute include Daniel Maldonado, a New Hampshire convert who was convicted in 2007 of training with an Al Qaeda-linked militia in Somalia; Tarek Mehanna, a 28-year-old pharmacist arrested for conspiring to attack Americans; and two young Virginia men held in Pakistan in 2009 for seeking to train with militants."  The article adds that "Qadhi's

---

[16]  As filed, the purported affidavit is formally defective, because it is an unsigned document that does not satisfy the formal requirements of 28 U.S.C. § 1746.

[17]  The Federal Rules of Evidence ("FRE") do not apply at sentencing, see FRE 1101(d)(3), and sentencing courts therefore need not apply to expert opinions the full strictures of FRE 702 or the authorities interpreting that Rule, like Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), in order to consider them.  See United States v. Martinez, 136 F. App'x 415, 417 (2d Cir. 2005).  Cf. United States v. Gushlak, 728 F.3d 184, 197 n.10 (2d Cir. 2013) (Daubert inapplicable at restitution hearing).  Nevertheless, information must not be considered at sentencing unless it has "sufficient indicia of reliability to support its probable accuracy."  United States v. Simmons, 164 F.3d 76, 79 (2d Cir. 1998).

[18]  Andrea Elliot, "Why Yasir Qadhi Wants to Talk About Jihad," The New York Times Magazine (March 17, 2011), https://www.nytimes.com/2011/03/20/magazine/mag-20Salafis-t.html.

[19]  CNN, "Terror suspect attended 2008 Islamic 'knowledge fest' in Houston," http://www.cnn.com/2009/US/12/30/terror.suspect.seminar/index.html.

onetime mentor, Ali al-Timimi," who was an Islamic cleric in Virginia, was convicted and sentenced to life imprisonment for, inter alia, soliciting others to levy war against the United States.[20]  It is thus fairly clear that Dr. Qadhi has had broad exposure to radical ideologies; but the sheer number of his associates and students who went on to be convicted of crimes of terrorism casts grave doubt on his ability to reliably determine whether a person poses a threat of extremist violence.  Even setting aside this dubious track record, Dr. Qadhi offers no reliable methodology for making such an assessment.  His purported expert affidavit is, for all practical purposes, a lay opinion about the defendant's character based on a single conversation.

Additionally, as Dr. Vidino lays out in greater detail, several of the premises underlying Dr. Qadhi's reasoning are dubious or incorrect.  First, Dr. Qadhi bases his conclusions on his view that the defendant "represents a standard, somewhat stereotypical, case example" of a young Muslim who was vulnerable to radicalization because of theological ignorance.  See Qadhi Aff. ¶¶ 7–8.  The defendant devotes an entire subsection of his resentencing submission to an argument that he presents a "typical" profile for "mature adjustment," premised upon this opinion.  See Def. Mem. at 53–56.  As Dr. Vidino notes, however, "one of the very few virtually unanimous findings of an otherwise very divided academic literature on the subject" is that "there is no common profile of radicalized jihadists." Vidino Aff. ¶ 6.  And indeed, theological education, which the defendant professes now to have, does not provide a sure remedy, since "many jihadists have advocated, perpetrated, or attempted to perpetrate violence despite a high degree of religious and theological education," including "prominent jihadist leaders like Usama Bin Laden" as well as "the tens of thousands of recruits of various terrorist groups who have graduated from radical madrassas (Islamic schools) in places like Pakistan or Somalia." Id. at ¶ 7.  Such highly educated jihadists also include "Umar Farouk Abdulmutallab, the so-called 'Underwear Bomber,'" who was Dr. Qadhi's own pupil. Id. at ¶ 9.

Second, Dr. Qadhi's opinion places significance in the fact that the defendant went to Cairo, because in Dr. Qadhi's view, "Egypt is not the destination that one chooses to go to in order to join a militant group."  Qadhi Aff. ¶ 12.  That assertion apparently seeks to minimize the defendant's culpability by calling into doubt the seriousness of the conduct for which he was convicted at trial—and, as Dr. Vidino says, it is also wrong.  Some Americans, like Kaziu, have travelled to Egypt "as a stepping stone to then travel to other countries to join jihadist groups and fight," especially "in the late 2000s, as there were not many countries to which an aspiring jihadist, particularly if lacking strong personal connections to established jihadist groups, could travel to fight."  Vidino Aff. ¶ 11.  For instance, Egypt "was the destination of choice of Daniel Maldonado and Omar Shafiq Hammami.  The two American

---

[20] See also James Dao, "Muslim Cleric Found Guilty in the 'Virginia Jihad' Case" (April 27, 2005), The New York Times, https://www.nytimes.com/2005/04/27/us/muslim-cleric-found-guilty-in-the-virginia-jihad-case.html.

Muslims travelled to Egypt in 2005 and months later travelled to Somalia, where they joined the al Qaeda-affiliated jihadist group al Shabaab." Id.

Third, Dr. Qadhi relied heavily on the defendant's answer to Dr. Qadhi's question about the meaning of jihad, which Dr. Qadhi regarded as "fit[ting] perfectly with the paradigm of the wise and mature repentant." Qadhi Aff. ¶ 15. Indeed, Dr. Qadhi called this question "the true litmus test." Id. ¶ 16. Of course, there is no litmus test. As Dr. Vidino explains, there is a spectrum of possible answers to this question, and it is unsurprising that the defendant gave Dr. Qadhi the answer that Dr. Qadhi wanted to hear. Vidino Aff. ¶ 12. Dr. Qadhi's opinion is simply not probative of whether the defendant continues to pose a threat of extremist violence. His opinion should be disregarded.

### 5.   Protecting the Public Requires a Significant Sentence

The evidence adduced at trial reflected the defendant's commitment to the global jihadist cause, and Judge Gleeson observed that the defendant's demeanor at trial and at sentencing reflected this commitment. From the start of his radicalization, the defendant was determined to become a mujaheed, and he overcame obstacles to persist toward this goal. When his friend and co-conspirator tried to abandon the criminal plot, the defendant did all he could to stop him. The defendant devised a new plan to kill U.S. peacekeepers in Kosovo. Just days before his arrest, as he planned a trip to Pakistan to join the Taliban, the defendant composed a poem about his desire to die for the jihadi cause and to stand "[i]n front of Allah leaking in blood." See Exhibit H. The defendant recorded a martyrdom video of himself declaring that he would soon be in jannah, i.e., paradise. See Exhibit J. Regardless of difficulties, the defendant continued toward his goal to fight and die a martyr. The evidence showed that the defendant was a committed terrorist who believed his actions were justified.

Importantly, even now, although he professes to have reformed his religious beliefs, the defendant still minimizes his conduct and does not accept full responsibility for its seriousness. In his letter to the Court ("Def. Letter"), the defendant expresses regret for his "horrible views and beliefs" that "have contributed to Islam-phobia," Def. Letter at 1, and says that he was "led . . . to follow and adhere to extreme, criminal interpretations" of Islam, and "fell into these false and delusional views," id. at 4–5. But as Judge Gleeson said at the original sentencing, the defendant was not arrested or prosecuted because of his religious beliefs or extremist political views; rather, he was arrested and prosecuted "because [he] decided to kill in furtherance of those beliefs[,] and the evidence, that included [his] martyrdom video and farewell messages, shows that [he] came pretty close to doing that." Sentencing Tr. 22. The defendant still attempts to minimize his culpability when he admits in his letter that he "wanted to wage 'jihad' whatever that was," Def. Letter at 6, hedging his admission with quotation marks around "jihad" and a minimizing clause. The defendant expresses gratitude that he "was arrested and brought back to [his] home country where [he] was allowed to re-build, refine [him]self, re-establish and strengthen [his] bond with his family," and he admits that this "new start" "would probably not have occur[r]ed otherwise." Id. at 12. But he leaves out the reason why it probably

would not have occurred otherwise: that is, because if the defendant had not been arrested, he would have consummated his efforts to kill people and get himself killed in his determination to wage jihad and die a martyr.

The defendant's reliance on empirical research that purportedly suggests that terrorism offenders are less likely than other offenders to recidivate is also misplaced. Indeed, the defendant concedes that because of the historical fact that jihadist terrorism offenders "have only begun to return to society since around 2010," there is an "empirical paucity" of relevant recidivism data. Def. Mem. at 40. Additionally, the most serious crimes often have low recidivism rates for the simple reason that fewer offenders return to society at all, or only return in relatively old age.[21] There are simply no data from which to reliably conclude that the defendant is unlikely to re-commit himself to jihad or give support to terrorism.

In sum, although the defendant professes to have moderated his views, his views were not the basis for the criminal charges against him—his conduct was. And even today, the defendant persists in minimizing the seriousness of his conduct, indicating that he still does not appreciate the wrongness of his actions and is professing moderation now opportunistically, in light of a potential opportunity for resentencing.

For these reasons, the Court need not, and should not, take the defendant's letter "at its word." Def. Mem. at 55. The sentence imposed in this case must protect against the possibility that the defendant will again attempt to inflict or otherwise support the infliction of violence against Americans and their allies. Only a significant sentence would be "sufficient but not greater than necessary" to achieve that goal and to protect the public from the risk that the defendant could return to jihad. 18 U.S.C. § 3553(a).

6.   Deterrence Weighs Heavily in Favor of a Significant Sentence

Deterrence is a key factor in the Court's assessment of the appropriateness of the defendant's sentence. A significant sentence appropriately sends a message to the community at large that the United States does not tolerate such abhorrent criminal conduct. An additional downward departure based on a change in law that does not bear on the principal counts of conviction would undermine that message. Given the compelling need to deter the continued threat that home-grown terrorists like the defendant pose to the United States and our allies, a

---

[21] For instance, in one of the most significant recidivism studies ever undertaken, the Bureau of Justice Statistics followed for three years more than a quarter of a million inmates who were released in 1994—comprising two-thirds of all prisoners released in the United States that year. The lowest same-crime recidivism rate recorded was for homicide: only 1.2% of those released in 1994 after serving time for homicide were re-arrested for homicide within the period of the study. Patrick A. Langan & David J. Levin, "Recidivism of Prisoners Released in 1994," Bureau of Justice Statistics Special Report, https://www.bjs.gov/content/pub/pdf/rpr94.pdf.

significant sentence is needed to send a clear message to any would-be jihadists that such conduct is not tolerated.

   7.   The Second Circuit Rejected the Defendant's Arguments Concerning Sentencing Disparity

   The defendant raises again the same argument made at his original sentencing and on appeal concerning unwarranted sentencing disparity.  But now as on appeal, he "fails meaningfully to compare the facts of those cases to his own. Many of the defendants Kaziu asserts received more lenient sentences either pleaded guilty or did receive comparable punishments of more than 20 years in prison for material support of a terrorist organization." 559 F. App'x at 40 (2d Cir. 2014) (citing United States v. Fernandez, 443 F.3d 19, 32 (2d Cir. 2006), which rejected disparity challenge where there was no showing that defendants were "similarly situated").  See also United States v. Coppola, 671 F.3d 220, 254 (2d Cir. 2012) (stating that § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and that assigned weight is "firmly committed to the discretion of the sentencing judge" (internal quotation marks omitted)).

   Additionally, the Second Circuit has held that "concern about unwarranted disparities is at a minimum when a sentence is within the Guidelines range," in part because one of the purposes and effects of the Guidelines is to avoid such unwarranted disparities.  United States v. Irving, 554 F.3d 64, 76 (2d Cir. 2009).  "Thus, where . . . the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." Id. (internal quotation marks removed).

   8.   A Sentence No Shorter than the Original Sentence Would Reflect the Seriousness of the Offenses, Promote Respect for the Law, and Provide Just Punishment

   There are few more serious offenses in the federal criminal code than conspiring to kill overseas, conspiring to provide material support to terrorists, and attempting to provide material support to a designated foreign terrorist organization.  Indeed, in a recent case with similar counts of conviction, in which a young American who had become radicalized then conspired to provide material support to a foreign terrorist organization (and like the present case, without final consummation of his efforts), the Second Circuit vacated as substantively unreasonable a sentence of 17 years, which was a downward departure from a Guidelines sentence of 85 years.  See United States v. Mumuni, 946 F.3d 97 (2d Cir. 2019).  The Second Circuit described the sentence of 17 years as "a shockingly low sentence that, if upheld, would damage the administration of justice in our country." Id. at 206.

   In Mumuni, the district court departed downward from the Guidelines range of 85 years by relying, in part, on the defendant's youth at the time of the offense, his lack of a criminal record, and his lack of disciplinary infractions during his period of incarceration before

sentencing.  Id. at 111–12.  The Second Circuit noted "the uncontroversial proposition that a District Court's major departure from the Guidelines should be supported by a more significant justification than a minor one," id. at 112 (internal quotation marks and brackets omitted), and held that these three factors could not bear the weight assigned to them.  Id.  In fact, the Second Circuit held that "no substantially mitigating weight can be borne here by the fact that [the defendant] did what was plainly required of him—that is, behaving himself in prison," id. (emphasis added), because such compliance is merely the minimum expectation, rewarded through good time credit, and moreover "has no bearing on the sentencing factors a district court must consider under 18 U.S.C. § 3553(a)."  Id.  Similarly, the court held that the defendant's "age and lack of prior criminal record cannot bear the mitigating weight [that the district court] assigned to them," id., and that the sentence of 17 years imposed in reliance on these factors "shock[ed] the conscience and cannot be located within a permissible range of decisions."  Id.

> The sentence of 27 years that the trial judge imposed in this case already reflects a substantial downward departure from the Guidelines sentence of life imprisonment.  A further downward departure would not reflect the seriousness of the offenses, promote respect for the laws or provide just punishment for the defendant's criminal conduct.  A further downward departure is unwarranted.  18 U.S.C. § 3553(a)(2)(A).

IV.    Conclusion

> For the reasons set forth above, the government respectfully submits that the Court should vacate the defendant's conviction and sentence on Count Four and leave the concurrent sentences on the other counts in place; and that, if the Court decides to re-sentence the defendant, a sentence of 27 years, as the trial judge previously imposed, is a fair sentence that is sufficient but not greater than necessary to achieve the statutory goals of sentencing.

Respectfully submitted,

SETH D. DᴜCHARME
Acting United States Attorney

By:      /s/ Robert M. Pollack
Robert M. Pollack
Assistant U.S. Attorney
(718) 254-6232

cc:  Clerk of the Court (FB) (by ECF)
     All counsel of record (by ECF)