# STANLEY L. COHEN

ATTORNEY AT LAW

79 Blackberry Lake Road
P.O. Box 629
Jeffersonville, NY 12748
(845) 482-4562
(917) 544+5471

April 16, 2021

The Honorable Frederic Block
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Betim Kaziu*
Criminal Docket No. 09-660 (FB)

Dear Judge Block:

This letter brief is submitted in reply to the government's sentence memorandum and to supplement the information and arguments set forth in our initial filing. Though the government does address a number of Mr. Kaziu's underlying legal arguments,[1] in its race to convert a de novo re-sentence into a rubber stamp of the one imposed long ago (and before the invalidation of at least one count in the original sentencing calculus) it goes to great lengths to focus, almost exclusively, on an unrealistic apocalyptic view of the underlying conduct at bar.

In this vacuum, with mechanical parse, the government seeks to spin the real-world conduct a dozen years ago of, then, 21 year old Betim Kaziu into the same circle and sentence range of cases where those convicted of terrorism offenses engaged in actual extremist violence. It is a palpable remake that does not fit.[2] In its crafted overreach to convince the Court that the 180 month cap which Mr. Kaziu seeks is substantively unreasonable, the government posits one case, and one alone, where a sentence was vacated for "drastically discount[ing] the seriousness ... [of the] offense conduct based on a sterilized and revisionist interpretation of the record." *United States v. Mumuni*, 946 F.3d 97, 106 (2d Cir 2019). To the degree the government relies on *Mumuni* as an example of a terrorism sentence upended on appeal as an unreasonable downward departure it is, when contrasted to the case at bar, a factual comparison without compare.

In *Mumuni* the defendant who pledged allegiance to ISIS was convicted of (1) conspiring to provide material support—including services and himself—to a foreign terrorist organization; (2) attempting to provide material support to ISIS; (3) conspiring to assault federal

---

[1] It should be noted that in its reply the government does not challenge the defendant's argument that given the drop of count 4, the surviving counts are, for purpose of resentence, but one inchoate offense. *See* Dkt. # 300, p.66, at IV. Nor does it take issue with the defendant's application that the court in its inherent discretion should reject an automatic, horizontal criminal history leap under 3 A1.4 from level I to level VI. *Id.* p.32, at D. Finally, the government does not rebut defendant's argument that empirical research indicates he is less likely to recidivate than those charged with traditional crimes. *Id.* p.36, at E.
[2] But for a description *infra* of the conduct and sentences meted out in matters where the Government's own expert Dr. Lorenzo Vidino testified, as well as other relevant terrorism cases that have come down since defendant's initial sentence memorandum, Mr. Kaziu will not repeat here the litany of like prosecutions where those accused of conduct equal to or significantly worse than his, received sentences throughout the country far less than that originally imposed on him.

STANLEY L.COHEN

officers; (4) attempted murder of federal officers; and (5) assault of a federal officer with a deadly or dangerous weapon. In support of these convictions the sentencing court was faced with and largely ignored undisputed, overwhelming evidence of a sophisticated plot involving multiple individuals and overt acts to commit mass murder in the United States and abroad. The terrorism spree also included at least one attempted armed assault of a federal officer in New York City and another, actual attack, in which Mumuni attempted to murder an unarmed FBI agent by stabbing him multiple times with an 8 inch knife he retrieved from his bedroom. In the ensuing struggle, he attempted to unleash further lethal havoc by reaching for the trigger of a fellow agent's assault rifle. *Id.*

In vacating the 17 year sentence,[3] and noting "the exceptionally serious nature of Mumuni's conduct," the Second Circuit detailed a plot which was a veritable working definition of aspirational terrorism at its worst; a conspiracy not just to travel abroad to join ISIS to commit deadly mayhem (with numerous overt acts undertaken in furtherance of it within the U.S.) but one which carried interim plans to unleash domestic death and destruction. Indeed, *Mumuni* is noteworthy, if not remarkable, for the very kind of planning and terrifying conduct that is markedly absent in the matter of Betim Kaziu.

Thus, in a chilling recitation of the facts, the Circuit Court took note that the defendant's "offense conduct begins with his considerable efforts to provide material support to ISIS." Among his overt acts, the court identified a five month period during which Mumuni and others helped facilitate the travel of a coconspirator to Syria to join ISIS which included accompanying him on a shopping trip to purchase equipment that would be of help to him while in ISIS held territory. Throughout this time Mumuni and a coconspirator (a "full-fledged" member of ISIS) began to save money for their own journey to Syria and researched flight schedules to do so. During this time, Mumuni and others planned an attack against law enforcement and, when arrested, detailed four separate occasions when he intended to attack officer were they to approach him or attempt to interfere with his travel to Syria. As part of this effort, a coconspirator not only offered a pressure-cooker bomb to Mumuni but obtained authorization from a "notorious Syria-based ISIS attack facilitator" to carry out his planned suicide attack. *Id.*[4] In planning for the most deadly attack on officers, Mumuni was instructed by a coconspirator to use a bomb and fight afterwards. After seeking further direction Mumuni was told he should "first detonate a bomb, run over the officers with a vehicle, seize their weapons, and then use the weapons to shoot at other victims." Several days later coconspirators executed an attack on an FBI agent who had been trailing them. When their high speed evasive maneuvers including driving with their lights off and running stop signs failed, they stopped their vehicle and charged

---

[3] Although the adjusted guidelines called for a sentence of life imprisonment, the maximum statutorily authorized sentence was 85 years.

[4] In its decision the court noted verbatim evidence of the exchange: "Selah: Akhi [brother] help us out, i have an akh [brother] who is planning on hitting a black car cop with a pressure cooker, the black car keeps following him, and he wants to avenge our akhs [brothers] who have been raided and blocked from hijrah [migration] . . . Is it permissible for him to do the attack and die purposely in the process? Hussain: Yes akhi [brother] he can do an isthishadi [martyrdom] operation on the police akhi [brother] . . . If he has no other way to fight them he can do it." *Id.*

STANLEY L.COHEN

him armed with a knife. *Id.*[5] Two days later while in the presence of his mother and sister, Mumuni repeatedly stabbed an FBI agent, who had arrived with others to execute a search warrant at his home. *Id.*[6][7]

In vacating the sentence which included a computation of but 7 years for the attempted murder of the FBI agent, the Second Circuit court reasoned "[t]his clearly erroneous assessment of the evidence leaves us with the definite and firm conviction that a mistake has been committed—a mistake that resulted in a shockingly low sentence that, if upheld, would damage the administration of justice in our country." 946 F.3d at 106. [8]

Betim Kaziu is not Fareed Mumuni. Nor is he Adel Daoud, whose 16 year terrorism sentence was also vacated as substantively unreasonable where he pressed a button to detonate a fake bomb supplied by the FBI that would have killed hundreds of innocent people; who, in custody, solicited the murder of the FBI agent who supplied the fake bomb; and who, while awaiting trial, tried to stab another inmate to death using makeshift weapons after the inmate drew a picture of the Prophet Muhammad. *See United States v. Daoud*, 980 F.3d 581 (7th Cir. 2020). Nor does his actual conduct mirror the many other terrorism related prosecutions cited in our initial memorandum where those convicted of offenses equal to or far worse than his, received sentences significantly less severe than the one he received twelve years ago.

This submission does not seek to revisit either the nature and circumstances of the matter for which Betim Kaziu was convicted many years ago or the mitigation material, both factual and legal, which was presented to Your Honor in our initial sentence memorandum. *See* Dkt #300 p.6, A. We believe it speaks for itself and remains no less compelling today. We do however wish to supplement it with an update on just how the last year behind bars has impacted Betim Kaziu, as we believe it to be entirely relevant and material to the imposition of an appropriate de novo resentence. In addition, we take this opportunity to challenge some of the government's assertions and argument in their reply to our initial submission and, with sentence parity in mind, briefly flesh out a number of like cases that have occurred in the time since our original sentence memorandum. Under all these circumstances it is respectfully submitted that in the light of Mr. Kaziu's actual conduct; his life before the events at bar (*see* Dkt. #300 p. 8 at B)

---

[5] In order to escape their attack, the agent was forced to reverse off of the highway and drive directly into oncoming traffic. Not long thereafter the coconspirators were arrested and the knives recovered including one that had been equipped with a built in window breaker that would have permitted them to enter the agent's vehicle. *Id.*

[6] A subsequent search of a vehicle owned by Mumuni's mother, uncovered another large kitchen knife in a duffle bag.

[7] On the basis of the "exceptionally serious nature of Mumuni's conduct" when he attempted to kill the agent ("an act of terrorism for which he had received advance authorization from a Syria-based ISIS operative") the government, in seeking a maximum sentence, noted a similarity to other terrorism defendants who had been recruited by the same foreign ISIS operative to commit like domestic terror attacks in the United States. No such comparison may be drawn with the facts at hand.

[8] In remanding for re-sentence the Second Circuit instructed the sentencing court to pay particular attention to: (a) the nature and circumstances of the offense; (b) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (c) the need for the sentence imposed to afford adequate deterrence to criminal conduct; and (d) the need to protect the public from further crimes of the defendant. (As of this submission, Mumuni's resentence has been continued due to COVID related scheduling problems and his request for an in-person appearance).

STANLEY L. COHEN

and rehabilitation since (*id.* p.42 at F); the fact that at least one of the counts upon which he was convicted is now invalid [9] and in due consideration of 18 U.S.C. § 3553, a de novo resentence of no more than 180 months would be reasonable and appropriate.

A. In fashioning an appropriate sentence the Court should consider the unique circumstances of defendant's imprisonment over the last year.

*"America's prisons, jails and detention centers have been among the nation's most dangerous places when it comes to infections from the coronavirus. Over the past year, more than 1,400 new inmate infections and seven deaths, on average, have been reported inside those facilities each day. The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting disease. Social distancing is not an option. Testing was not a priority inside prisons early in the pandemic. With little public pressure, political leaders have been slow to confront the spread."*[10]

Since the advent of the COVID crisis in the United States,[11] prisoners have occupied a uniquely vulnerable position in society, unable to control their contact with others, while confined and at the mercy of epidemiological happenstance. Intractable, continuing problems such as overcrowding in federal penitentiaries have shown in stark relief the dangers of incarceration in biologically uncertain times, as the penetration of the virus from the outside world—via corrections staff or visitors—has torn through hundreds of jails and prisons in the United States since March of 2020. FCI Danbury went into lockdown that spring, and movement of prisoners was sharply curtailed.[12] A second lockdown occurred in the fall, as new COVID infections exploded in the Northeast of the US. In a single month of data collection during April 2020, more than 9,400 cases emerged in state and federal prisons across the United

---

[9] Although Your Honor has not as yet ruled on defendant's constitutional challenge to count one of his original conviction, it is respectfully submitted that even should the Court uphold it, under the attendant circumstances, the proposed resentence cap of 180 months would nevertheless be just and reasonable.
[10] https://www.nytimes.com/interactive/2021/04/10/us/covid-prison-outbreak.html?_campaign_id=9&emc=edit_nn_20210411&instance_id=29113&nl=the-morning&regi_id=13612801_8&segment_id=55362&te=1&user_id=cf06250f1047cba6655e00507f67e960

[11] The United States Secretary of Health and Human Services declared COVID-19 a public health emergency on January 31, 2020. The President of the United States declared a National Emergency on March 13, 2020.
[12] On April 1, 2020, The Bureau of Prisons implemented a modified-lockdown order. The 122 federal prisons were ordered to confine federal detainees to their cells for two-weeks in order to control transmission of the coronavirus. By May 27, 2020, over 5000 federal prisoners and over 600 BOP staff had tested positive for COVID-19. *See Federal Prison System Goes Into "Modified Lockdown,"* Government Executive, April 1, 2020, https://www.govexec.com/management/2020/04/federal-prison-system-goes-modified-lockdown/164286/. According to the BOP as of 4/9/2021 there are currently 208 federal inmates and 1,254 staff with confirmed positive test results for COVID-19 nationwide. Since the on-set of the pandemic there have been 230 federal inmates and 4 BOP staff deaths attributed to COVID-19 disease, with 46,792 inmates and 5,541 staff having recovered. *See* https://www.bop.gov/coronavirus/.

STANLEY L.COHEN

States according to an analysis by The Marshall Project. The number of cases grew three-fold in the final week of the one-month study. More than 140 people had died. By June 4, 2020, The Marshall Project reported at least 40,656 cases of coronavirus among prisoners, and nearly 500 deaths.[13] As of today, in "federal facilities, at least 39 percent of prisoners are known to have been infected. The true count is most likely higher because of a dearth of testing, but the findings align with reports from The Marshall Project and the Associated Press, U.C.L.A. Law and The COVID Prison Project that track Covid-19 in prisons."*See* fn.10, *supra*.

Betim Kaziu has lived this past year in FCI Danbury in a state of suspension—unable to see his elderly parents, who can no longer visit; unable to study or take any classes to improve his mental health or preparing for a life after prison whenever that should come; and unable to gather with his co-religionists to worship, with the attendant impact on his Qur'an studies, and his spiritual practice.   His family on the outside has experienced deaths and birth, and illness, but Mr. Kaziu is cut off from them; likewise he can no longer pray with other Muslims at the facility, due to social distancing requirements.  The prison chapel has been closed for a year now, with no sign of re-opening anytime soon for the more than thirty men who participate in Friday *juma'ah* worship services.[14]

Mr. Kaziu was diagnosed with full-blown COVID in late June of last summer—he suffered a sudden-onset high fever, with respiratory distress, which plunged him into terrible weeks of nausea, fatigue, loss of consciousness on standing, and loss of taste and smell.  Betim believes the "patient zero" in his housing unit at the low-security setting of FCI Danbury was a prisoner who was mistakenly diagnosed with pneumonia in the early part of the outbreak, and was not sequestered until several days into his illness.  By the fall of 2020, Danbury had suffered more than 600 cases; Mr. Kaziu reports that in his specific housing unit, more than seventy men got sick. He believes at least one inmate died, and a two more were hospitalized with potentially fatal symptoms.  His unit has an open dormitory arrangement, with military-style bunk beds; once a single prisoner became ill, it was fore-ordained that all would fall sick with the virus.  The dining hall was closed some nine months ago as a precaution, to keep housing units from inter-mingling; now prisoners grab food trays outside the kitchen, and return to the dormitory to eat at their beds. Seventy men share six toilets and six sinks on the unit, and hygiene has suffered as the men are cooped up for weeks at a time, with only scant access to fresh air and outside relief; many prisoners stopped bathing, as they were frightened of the close contact in the damp, non-sterile and cramped shower areas.  Daily recreation was cancelled a year ago, and prisoners in the low-security facility get erratic, once-a-week (or less frequent) moments to go outside in small groups for an hour.  At

---

[13]The Marshall Project, *A State-by-State Look at Coronavirus in Prisons*, The Marshall Project, June 4, 2020.

[14] Like Sundays for Christians and Saturdays for Jews, *juma'ah* is the weekly Friday prayer meeting for observant Muslims. For prisoners of all faith, these congregational prayers are especially important providing great personal relief, strength and direction in dealing with the systemic difficulties of prison life and a play an important, helpful role in a prisoner's on-going personal rehabilitation.

STANLEY L.COHEN

night, Betim reports, "twenty guys are snoring around you," and the stench is repulsive. As noted in recent news reporting,[15] "Minimum- and low-security settings like the federal prison at Danbury, where many inmates live in large dormitories separated by partitions that don't reach the ceiling, are even more conducive to the spread of the virus than maximum-security prisons with cells that house only one or two inmates."

Indeed, the results have been predictable: "The coronavirus has infected more than 620,000 inmates and correctional officers in the nation's prisons, jails and detention centers, according to a New York Times database. Nearly 2,800 inmates and guards have died, making correctional facilities among the most significant battlefronts of the pandemic, along with nursing homes and schools."[16] Specifically, at FCI Danbury, there have been at least two distinct spikes, and in the most recent surge of cases, ten percent of inmates were infected: "In December, cases at Danbury rebounded as more than one in 10 inmates at the complex tested positive for the virus."[17]

While masks have been provided to prisoners, hand sanitizer is not available, unless a prisoner purchases it with his own commissary money; in any event, the sanitizer is nearly always sold out and unavailable, with or without funds to pay for it. Mr. Kaziu concedes that he has developed a "germ phobia" in the past year, which he believes is partly irrational, but he cannot stop worrying about getting sick again, noting that there normally are other viruses and bacterial problems in an unhygienic prison setting, and that vulnerability to COVID makes all those problems worse.

Mr. Kaziu reports that he "feels okay" now, and has recovered his health, although he suffers some lingering effects since his illness, including moments of "brain fog," and feeling the compounding, grinding effects of psychological stress, which have mounted and exploded in the prison population, as prisoners cope with the loss of recreation, visits from family, circulation out of the dormitory, and increased crowding. "Stress is out of control here now," he says, noting that prisoners are fearful, mistrustful of one another, and isolated. Mutual respect levels are in decline, Betim observes, with "younger guys losing it," or having episodes of anger or "cracking up," unable to exercise self-discipline in the on-going crisis, with incidents of arguments, threats and violence increasing. "It takes discipline and good luck," Betim advises, to stay out of trouble, and not get written up for some minor infraction, as prisoners and staff alike break under the stress of the epidemic and lockdown. Indeed, Mr. Kaziu specifically fears that the longer he stays at

---

[15]Roni Caryn Rabin, "Vulnerable Inmates Left in Prison as COVID Rages," *The New York Times,* 27 Feb. 2021.

[16]*Id.*

[17]*Id.* The scenario at FCI Danbury is amply detailed in reporting by *the Times,* including disturbing scenes of chaotic non-response: "When inmates felt sick, they often had to chase down medics and plead to be tested, and later beg for the results. Inmates weren't removed from the general population until the results came back, which could take five days. When prisoners were secluded in groups after testing positive, they were left largely to fend for themselves, without basic supplies like acetaminophen or extra fluids. To call for help, they banged on the windows."

STANLEY L.COHEN

Danbury, the more likely it is that his near-perfect[18] discipline record will be marred by some petty event precipitated by the stresses of the environment. Just recently, Betim was "written up" by a corrections officer for a discipline infraction—in this case, having his shirt un-tucked while outside the dormitory (which he notes was incorrect, as he was inside the dormitory entrance). The perhaps over-zealous officer subjected Betim to a pat-down search of his body, violating the social-distancing rules; his protestations triggered a second discipline violation for disobeying. When Betim appealed the infraction on his record to the commanding officer, the lieutenant agreed with Mr. Kaziu, and removed the black marks from his record. "But I'm worried it's only a matter of time before something happens to me in here, I'm stressing all the time, and so is everyone else," Betim says. "A guard could decide he's going to make my life hell, and there's nothing I can do about it."

Recreation and exercise—which are known to keep incarcerated populations manageable by reducing stress—has been severely curtailed during the lockdowns and general environment of the COVID year—while officially, recreation is supposed to be every other day, in actual practice, it has been cancelled most times for a year, and they only get outside once a week. In addition, the inmates at Danbury are prohibited from using any of the exercise equipment, or playing any ball games or team sports. The only permissible activity is walking outdoors in the field, or running, during the brief respites they are afforded weekly from the dormitory. Most recently, library time is offered again, but only for legal access to case-law material; if an inmate opts for library time, he will not get his recreation hour.

The year of COVID has most of all revealed the stresses in prison life when one can no longer have contact with family on the outside. For Betim, his regular visits from his devoted parents and siblings, driving up from the city, kept his hope and his faith alive in his heart, and have done more to help with his personal reformation than any programs or punishments. Seeing his parents' faces—still imbued with love for him despite all that his happened, despite the ruination of his life as a young man—has kept him focused on his own redemption, to earn their good graces and love and to be a dutiful son, even while in prison. Since the pandemic began, no visits have been allowed for a year, and he has not seen his family in all this time—visits were only just re-approved this month, but Mr. Kaziu has told his elderly parents to stay away for the time being, as he does not want them risking unnecessary exposure, and as of this writing, they have not yet been vaccinated for the Coronavirus. In the intervening year, his sister had a baby who Betim has not yet seen; his closest uncle died of cancer, while a second uncle is in the hospital for chemotherapy.

---

[18] But for one fighting incident in 2011—when Mr. Kaziu was attacked by a prisoner spouting anti-Muslim hate—at FCI Allenwood at the very start of his sentence over a decade ago, Betim has had a flawless record while incarcerated. Mr. Kaziu describes the fight as a kind of "initiation" into prison life, after which he was mostly left alone, if still subjected to frequent verbal abuse by staff and other prisoners for his religious beliefs, and his status as a "terrorism" convict.

STANLEY L. COHEN

Mr. Kaziu notes that "lockdown never really stopped—we've been like this for a year now." Successive waves of the virus surge have meant all the socially-positive aspects of incarceration—that is to say, those elements of a prisoner's life which are rehabilitative—have evaporated, and the low-security men's facility at Danbury just feels like constant punishment, with no redemption. Betim feels like he has aged five years in the last twelve months—stress and ill health have weakened him, and if the pandemic does not end soon, things will get worse inside prison facilities. [19] In some respects, Mr. Kaziu wishes he were back in a tighter-security facility, where he would at least be separated from other inmates in a cell, perhaps with one other cell-mate, and less vulnerable to epidemiological risk. "This has been hard time here, even though it's just a low-security place," Betim notes. "I know this has been the toughest year I've done since I went to prison."[20]

### B. The Court should credit Dr. Qadhi's conclusions about Mr. Kaziu

As indicated in his original submission to the Court and supplemented by his most recent affidavit,[21] Dr. Qadhi has concluded that based on his face to face interview with Betim Kaziu, as well as his review of various court records and submissions, and in the light of the years Kaziu has spent imprisoned beginning from age 21, and his evolution since, the now 32 year old defendant manifests no indication of relapse into what was very much a period of relatively isolated and alienated juvenile conduct many years ago. Although Dr. Qadhi cannot predict with absolute certainty just how well he will do if discharged from prison and placed on intensive supervisory release, he has concluded that Betim Kaziu is no longer the ill informed and lost, angry young man who years ago fell prey to the extremist rhetoric and spell of the day.

Yasir Qadhi is no idle academic. Nor is he a naïve, detached dilettante regarding the preach of Islam, or the periodic bursts of misplaced extremism that claims its roots in this age-

---

[19] Indeed, for Betim Kaziu, and other inmate survivors, it may yet grow worse, with recent empirical data showing COVID recuperation does not render one immune from its potential deadly repeat. With growing numbers, there have been dozens of *documented* reinfections around the world, which is almost certainly an undercount with the most recent being here in the United States at the Greater Richmond Transit Company in Richmond, VA which reported a COVID-19 reinfection within the company in April 2021. https://www.wric.com/health/coronavirus/how-common-is-covid-19-reinfection-doctors-weigh-in-following-first-known-reinfection-within-grtc/. For this reason the CDC states that even if you test positive for antibodies "You should continue to protect yourself and others since you could get infected with the virus again." https://www.cdc.gov/ coronavirus/2019-ncov/testing/serology-overview.html#:~:text=Having% 20antibodies% 20to%20the%20 virus,this%20protection% 20may%20last.The steps to protect yourself continue to be staying at least six feet apart from others, masking and hand washing, getting vaccinated, as well as avoiding crowds and poorly ventilated spaces. https://www.cdc.gov/ coronavirus/2019-ncov/prevent-getting-sick/prevention.html. Of course, none of these essential safeguards are present or possible within an FCI setting.

[20] Unable to accomplish a face to face visit with Mr. Kaziu because of COVID restrictions, the information presented herein has been obtained through a series of discussions with Mr. Kaziu and his family by telephone.

[21] *See*, appended hereto, as Exhibit A, supplemental affidavit of Dr. Yasir Qadhi.

STANLEY L.COHEN

old faith. One of the world's most respected Muslim clerics, he has not only spent a lifetime in deep study and reflection upon Islam, its call, faith and promise, but worked with and counseled thousands of young men and women (many of them troubled, if not, torn) and their families often confused by the distortion, rhetoric and hate of the day; that propagated by Islamic extremist groups around the world, as well as that from Western supremacist groups which have often made it all but impossible for Muslims of all ages to practice their faith and culture with calm and simple pride.

There is no magic or simple series of talisman that can guarantee that those once trapped by the lure of religious extremism, ensnarled by its wretched scream and drive can quickly or easily escape its admittedly ugly reach. Yet reflection, regret and reform spread over time can, according to Dr. Qadhi, and other seasoned experts, facilitate the safe return of a lost young man or woman back to the true tenet of their faith, their home, and their community. Dr. Qadhi believes that Betim Kaziu has navigated that difficult journey, and is ready now to begin that reintegration process outside of from behind the bars he has called home for twelve long, painful and lonely years both for him and his family.

Very few have looked into the eyes of alienated, angry and confused young men and women seeking answers from a faith and tradition from which they ask guidance but at times are lost, indeed, overwhelmed by the tension between a rich and peaceful ancient history and the nihilism and victimhood suffered by tens of millions of Muslims over these last several decades. Yasir Qadhi is one such glance. Even fewer have toiled at providing relief and direction from that heartache. Yasir Qadhi is second to none in that effort.

In very much a parallel world, the government offers an affidavit from Dr. Lorenzo Vidino in opposition to the conclusions of Dr. Qadhi. Though the submission is rich and long in academic credential and experience, it takes issue not with the ultimate findings about the defendant's prognosis, but posits a brief, largely irrelevant, objection to several of Dr. Qadhi's points; challenges based not upon first hand interaction with or interview of Mr. Kaziu, for there has been no such meeting between the two, but rather abstract disagreement. Nor in reaching his conclusions, does Dr. Vidino refer to any material contained in the trial transcripts or discovery, the pre-sentence report and its update, or any discussions with witnesses to events that, for Betim Kaziu, occurred a life-time ago. To the contrary, the Vidino affidavit with its three inapposite points is little more than a compilation of one size fits all; a generic, academic application of sweeping stereotypical presumptions regarding all those charged with acts purportedly connected to Islamic extremism.[22]

As to the first two Vidino points, Dr. Qadhi agrees: not all young Muslims who go off to join what they consider to be obligatory Jihad are entirely unschooled or ignorant of many of the fundamental, literal tenets of Islam. As he notes, there are those who have spent considerable time in the study of Islam, becoming prolific in its words, but yet lost in their true, intended

---

[22] See, https://bridge.georgetown.edu/research/factsheet-lorenzo-vidino/. Authored by the Georgetown University affiliated *Bridge Initiative*, this report takes specific issue with the independence and objectivity of Dr. Vidino. The project self-describes as a "multi-year research project on Islamophobia which aims to disseminate original and accessible research, offers engaging analysis and commentary on contemporary issues, and hosts a wide repository of educational resources to inform the general public about Islamophobia."

STANLEY L.COHEN

meaning. Betim Kaziu was no such religious journeyman. Likewise, Dr. Qhadi agrees that, for some, Egypt has been a station-stop of sorts for those committed to ultimately joining an extremist group, while others, such as Mr. Kaziu, arrive on an aimless jaunt seeking a surreal bit role in an extremist world they do not understand, let alone truly embrace.[23]

Yet none of the conclusions reached by the government's expert on religious extremism sheds any reasoned light on three of the key considerations before the court under 18 U.S.C. § 3553 in crafting a reasonable and appropriate resentence for the defendant: 1) does he continue to pose an on-going threat to the community if released from prison now or in the near future; 2) has he exhibited signs of personal growth and rehabilitation over the many years of his imprisonment; [24] and 3) can strict and long-term conditions of supervised released balance the needs and safety of the community as a whole with the liberty interests of the man that is the Betim Kaziu of today and tomorrow.   None of these concerns is addressed let alone resolved through the insipid, largely irrelevant submission of the government's expert.[25]

---

[23] Notwithstanding Dr. Vidino's marginalization of contemporary Egypt's role in Islamic tradition and study at the time of the defendant's journey, Dr. Qadhi reaffirms its age-old role as a cornerstone of immersion in both Islamic scholarship and Arabic teaching.

[24] As noted in defendant's opposition to the government's request to proceed to sentence on the papers alone, while, courts in the Second Circuit were, at one point, unable to consider post-conviction rehabilitation in prison as the basis for departure where a defendant was being resentenced for the "same offense" (*see Quesada-Mosquera v. United States*, 243 F.3d 685,686 (2d. Cir. 2001), it could not, in any event, apply to the facts of this case where Mr. Kaziu's resentence is for a different course of conduct and offenses than those for which he was originally sentenced. Under these circumstances the reasoning of *United States v. Core*, 125 F.3d 74, 75 (2d Cir. 1997)(post-conviction rehabilitation in prison may be considered in resentence pursuant to successful §2255 motion) remained undisturbed. *See, also, United States v. Bartz*, 2006 U.S. Dist. LEXIS 46395(D.Vt. 2006)(Murtha, J.)("post-offense rehabilitation has only been considered when a defendant is being re-sentenced for a reason that is independent of the rehabilitation."); *United States v. Lillard*, 2006 U.S.LEXIS 5944(N.D.N.Y. 2006(McAvoy,J.) ("under 3582(c) … 'post-sentence rehabilitation is not *by itself* a ground for modifying a sentence that has been lawfully imposed.")(emphasis provided)(internal citations omitted).

   However, any question about the need for a nuanced application of post-incarceration rehabilitation in the resentence calculus was ultimately put to rest in *Pepper v. United States*, 562 U.S. 476 (2011)(categorical bar on consideration of post-sentencing rehabilitation evidence contravenes 18 U.S.C.S. § 3661 and the Sixth Amendment. Such evidence is relevant to several of the 18 U.S.C.S. § 3553(a) factors).

[25] In contrast stands the declaration of Dr. Qadhi as well as the updated pre-sentence report detailing Mr. Kaziu' adjustment and activity during his years of imprisonment which establish that he satisfies these considerations by a preponderance of the evidence. Although the defendant is not seeking a downward departure in the classic statutory sense, where there is a dispute as to a relevant consideration bearing on sentence it has been held the burden of proof is the preponderance of the evidence. *See, generally, United States v. Gigante,* 94 F.3d 53 (2d Cir. 1996)(adjustments favoring the defendant met by preponderance of the evidence); *United States v. Cordoba-Murgas*, 223 F.3d 704(2d Cir. 2000)("Moreover, on multiple occasions, this Court has instructed that proof by a preponderance of the evidence is the applicable burden of proof when a sentencing judge is asked to assess disputed facts relevant to sentencing.").*See, also*

STANLEY L.COHEN

C. Dr. Vidino provides no relevant insight into Mr. Kaziu's status

On its face, Dr. Vidino has an impressive CV. Director of the Program on Extremism at George Washington University, he has a JD in International Law, an MA on Law and Diplomacy and Islamic Civilization and a Ph.D. in International Relations. Although fluent, to varying degrees, in Italian, English, Spanish, German, French and Dutch, he does not speak Arabic, Farsi, Urduh or any of the half dozen other dialects prominent throughout the Middle East, Gulf and Africa, regions at the heartbeat of the very subject matter about which he speaks, writes and, more recently, testifies to. Nor does it appear he has spent any time of consequence living or traveling in these very regions, although one must assume that if it were the case, that journey would be set forth in rich detail in his CV. It is not.

Most important, markedly absent from his academic credentials is any specialized training or qualification in Islamic theology which demands years of immersion in traditional study including in the Quran and Hadith,[26] and Islamic *fiqh* (jurisprudence) and *'aqidah* (creed/belief), essential steps on the pathway to the status of respected Islamic scholar or Imam. These disciplines are among those, according to Dr. Vidino, that have contributed to Dr. Qadhi's prominence as "America's most famous conservative Islamic cleric."

An author of several books on the Muslim Brotherhood and Al Qaeda and dozens of articles on terrorism, Dr. Vidino has a history of related presentations at conferences throughout the Western world. A court certified expert on ISIS, over the last several years he has been called upon by the government as his go to guy in prosecutions in various parts of the country providing background on ISIS, the role of U.S.-based ISIS recruiters and facilitators, the significance of certain language used by defendants in the commission of offenses, and some of the central factors used to assess an individual's so-called disengagement from a terrorist organization/extremist ideology. [27]

With this background in view it is entirely understandable why the Government has not submitted any opinion from Dr. Vidino as to the current status, rehabilitation or "threat assessment" of Mr. Kaziu who having been imprisoned at age 21 is, as noted, now 32 years old. Indeed, having not interviewed the defendant nor, apparently, examined the trial transcript, or any of the discovery, or relevant court documents, it would appear the sum and substance of the

---

U.S.S.G § 6 A1.3 (favoring preponderance-of-the-evidence standard for resolving all disputed facts issues at sentencing).

[26] The Hadith is the record of the traditions or sayings of the Prophet Muhammad a major source of religious law and moral guidance in Islam. http://www.oxfordislamicstudies.com/article/opr/t236/e0286.

[27] Dr. Vidino is not, however, a certified threat assessment professional or a credentialed forensic psychologist. *See* generally https://www.apa.org/monitor/2014/02/cover-threat American Psychological Association, *Threat assessment in action*, "Psychologists are leaders in the growing field of threat assessment, working with law enforcement and security professionals to prevent violence before an attacker strikes."

STANLEY L.COHEN

Vidino declaration is limited largely to a general and misplaced challenge to three of Dr. Qadi's points of consideration in his own report.

Yet, in other respects, the work, testimony and results of Dr. Vidino's past efforts on behalf of the Government should, upon examination, assist this Court in rejecting his "conclusions" here and reaching a reasonable and appropriate re-sentence in line with the one proffered by Dr. Kaziu. Thus, in the matter of *United States v. Caesar* Criminal Docket No. 17-48 (JBW) Criminal Docket No. 19-117 (E.D.N.Y)(JBW) [28], the defendant, a 24 year old woman with a history of physical and sexual assault, stood before the court convicted of conspiracy to provide material support to ISIS and then, while on release pending sentencing, obstructing justice by deleting numerous electronic communications she had with other individuals, including ISIS supporters, in order to prevent their detection by the government and the Court. *Id.*at 194-95. Arguing that the "the defendant – who to this day remains unrepentant for her actions" (and relying heavily upon the testimony of Dr. Vidino) the government sought a sentence within the advisory Guidelines range of 360 to 600 months' imprisonment.[29] *Id.*at 223.

In relevant part during his substantial testimony at the defendant' sentence hearing, Dr. Vidino opined at length about an extremist individual's capacity to leave terrorist groups such as ISIS and associated networks and to reintegrate safely into mainstream society and offered his opinion as to the defendant's progress toward these goals.[30] Like in the case at bar, Dr. Vidino did not interview the defendant but rather relied solely upon a review of her communications with others and recent time on presentence release. In concluding that the defendant exhibited objective indicators of her reengaging with ISIS should she be released from prison Dr. Vidino raised two "red flags" indicating such a danger: 1) maintenance of extremist views; and 2) engagement with people known by her to be ISIS supporters, including the same people he had been involved with during the underlying conspiracy. *Id.*at 207.

In support of these indicators, Vidino cited her communications while in prison, in particular one not long before sentence in which during a recorded telephone call she denied responsibility for her actions equating her support for ISIS with little more than the practice of her religious beliefs. *Id.*at 207-208. Several days before her call she sent an email from prison which stated "[i]m your friend I did not do anything wrong as a Muslim but a cyber crime in

---

[28] *Caesar* (referred to as *Jane Doe* by Dr. Vidino) and the cases to follow are cited in his CV as those in which he has appeared as an expert witness on behalf of the government.

[29] According to the Government' proof for almost a year before her arrest the defendant provided material support to ISIS as a "committed" recruiter and self described "assistant" connecting ISIS supporters in the United States to ISIS facilitators and operatives abroad. Specifically, she repeatedly used numerous social media accounts and other electronic communication platforms to proclaim her support for ISIS and violent jihad, to recruit for ISIS and to attempt to help others join and fight for the group. She also expressed her own desire to travel to ISIS-controlled territory in Afghanistan to join the group and die as a martyr; obtained and renewed a visa and began saving money to do so, and created and disseminated on social media her own ISIS propaganda, including the ISIS logo next to a photo of then President Obama with an exploding gun next to his temple.

[30] In considering the concept of reintegration Dr. Vidino described two concepts: disengagement and deradicalization with the former a behavioral process marked by a change in role or function that is usually associated with a reduction in violent participation; deradicalization is an attitudinal or cognitive process that is completed when the commitment to and involvement in violent radicalization I reduced to the extent that the individual is no longer at risk of involvement and engagement in violent activity.

STANLEY L.COHEN

social media . . . to support certain shari'ah islamiya o al magreb tul horriya." Emphasizing her frequent documented explanations that she was prosecuted because of her religion, Dr. Vidino explained, was evidence that she retained the "mindset" of an ISIS supporter.[31] He concluded by testifying that the consequence of this behavior manifested the potential to reoffend.*Id.* In rejecting the generic prediction of Dr. Vidino, the Court imposed a sentence of 48 months and not the 360 to 600 month guideline sentence sought by the government. *Id.*at 223.

Other terrorism cases cited by Dr.Vidino on his CV as an expert witness for the government involved conduct comparable to or more sinister than that attributed to the defendant. Following conviction, by plea or at trial, the respective accused received sentences far less than the one originally imposed upon Mr. Kaziu, and which the government now seeks upon his resentence.

For example, in *United States v. Joshua Goldberg*, No.3:15-mj-1170 (M.D.Fla.2018)(Davis,J.) the defendant, a 23 year old, was convicted of attempted malicious damage and destruction by an explosive of a building. According to the plea agreement Goldberg, using an online name of "AusWitness," came to the attention of law enforcement while posting laudatory comments about a deadly attack by two gunmen that had occurred earlier at the Muhammad Art Exhibit and Contest in Garland, Texas. Before the attack, Goldberg posted a map of the location urging anyone within the area to attack the event. That posting was copied and used by the two gunmen in the attack, both of whom were killed in a shoot-out during it. Subsequently in another online posting Goldberg took responsibility for inspiring the Garland attack, as well as two others then in the planning stage.

In the run-up to his arrest, Goldberg held on-going exchanges with an informant (CI) for the FBI. Among other things Goldberg discussed getting an individual in Melbourne, Australia to carry out a terrorist attack and to have the CI carry out a bombing in the United States. Among his overt acts, Goldberg sent the CI five website links containing instructions for making various explosive devices, including pipe bombs. During subsequent discussion with the CI, Goldberg mentioned a plan involving the use of pipe bombs at a large public event and later suggested using a pressure cooker bomb instead as being more destructive. In another discussion with the CI, Goldberg identified as the "perfect place" to bomb, a fire-fighters event in Kansas City, Missouri honoring first responders that lost their lives in the 9-11 attacks. In preparation for that attack Goldberg instructed the CI to place the bomb near the crowd to ensure it was well hidden and to produce maximum damage. The following day Goldberg provided the CI a list of items to use in the pressure cooker bomb, including shards of metal, nails and broken glass. He further instructed him to dip screws and other shrapnel in rat poison to inflict more casualties. Goldberg concluded the planning noting that he would post a video of the bombing.[32]

---

[31] In contrast stands the post-arrest conduct of Mr. Kaziu. Thus, there is no evidence before the Court that during the course of his 12 years in prison Mr. Kaziu has in any way shape or form expressed or communicated in prison, or to those outside, support for ISIS or any other designated terrorist organization, activity or individual, or conveyed he was prosecuted on the basis of his faith, or engaged in any activity that can be characterized in any way as extremist.

[32] *See* https://www.justice.gov/opa/pr/florida-man-sentenced-10-years-federal-prison-bomb-charge

STANLEY L.COHEN

Following a mid trial plea,[33] Dr. Vidino testified at the Goldberg sentencing hearing on behalf of the Government. With a Guideline range of up to 240 months, Goldberg was ultimately sentenced to 120 months and lifetime supervision.

In *United States v. Alebbini*, No. 3:17-cr-00071-1 (S.D. Ohio 2017), aff'd 979 F.3d 537 (6th Cir. 2020) the defendant, a 29 year old legal permanent resident, was convicted at trial of material support of terrorism arising from, *inter alia*, his travel to Turkey en route to Syria to join ISIS *Id*.at.540-43. Arriving with an expired passport, he was returned to the United States by the Turkish government while his cousin traveled onto Jordan where he was arrested. *Id*.at 540. Not long thereafter Alebbini was himself arrested at the airport while preparing to board another flight. *Id*.at 542-43. Just before his arrest he had a series of exchanges with relatives who pleaded with him not to join ISIS. In three back-to-back text messages Alebbini said: "Do you think I am a criminal" "I am a terrorist" "I am mujahid." *Id*.at 542. In an earlier conversation with a friend Alebbini said, "I, cousin, want to go be an inghimasi soldier." *Id*.at 549. In a series of earlier monitored exchanges with a CI regarding the plans of he and his cousin he commented:

> "the truth is crystal clear [we are reaching]"the execution phase" of [our]plan. [O]ur duty is to support the Islamic State. ... What's our duty? Jihad. So, a person must be, I mean, must distance himself from the people of sin until it happens ... and if it happens and he is captured; then let them capture him." *Id*.at 542.

Evidence at trial established that Alebbini justified ISIS burning a Royal Jordanian Air Force pilot alive as payback for "help[ing] America against us" and asserted "the only one who shows the truth is honestly the Islamic State Organization." *Id*.at 541. At other times he discussed how he had watched pro-ISIS videos and recounted when he and Raid (his arrested cousin) were sitting in front of his laptop, watching ISIS videos, and Raid tossed the laptop saying, "Man why are we waiting over here? Let's act . . . . I want to go."On another occasion Alebbini opined "the Islamic State is fighting a survival war. They asked people to migrate to the State. When migrants get there they ask them what they learnt, what they studied and they will assign them accordingly to a diwan or a district." *Id*.at 549. In yet another instance, Alebbini stated that "[T]he solution . . . is to bear arms." *Id*.at 542. When asked by a CI whom he would fight with and against, he replied, "the State Organization" and "any regime that follows the US government."*Id*. He aspired to be a "martyrdom bomber," and that "[t]o fight America" he would offer himself up as "bait.*Id*. " He reiterated, "I must fight. I am a soldier!"*Id*.

---

[33] Trial was suspended when a question arose as to Goldberg's competence based upon a history of mental health issues. In rejecting a Rule 11(c) (1) (B) plea agreement calling for 96 months, the court imposed the higher 10 year sentence.

STANLEY L.COHEN

According to Dr. Vidino, who testified at length about ISIS in general, an "inghimasi soldier" is a suicide bomber who seeks to cause as much death and destruction as possible prior to detonation. He also described the process of assigning newly arriving volunteers to particular districts to be a fundamental part of ISIS administration. Convicted at a bench trial and facing a Guideline range of up to 480 months, Alebbini was sentenced to 180 months. *Id.*at 543.

In *United States v. Shafi*, 2018 U.S. District LEXIS 109484 (N.D.Cal.2018)(Orrock, J.) the defendant was tried for conspiracy to provide material support for terrorism by attempting to travel and provide himself in service to al-Nusrah, a spin off terrorist organization from Al Qaeda. Among the overt acts attributed to him over a period of several years were leaving his family while on holiday in Egypt to go and "protect Muslims," on-line research on how to travel from Turkey to Syria, phone discussions in which he was heard to say that "America was the enemy" and that he wanted to live in Syria. In addition, he and two younger brothers participated in "paramilitary style" training near their home. Ultimately Shafi purchased a one way ticket to travel to Turkey intending to continue onto Syria to join al-Nusrah. He was arrested while on his way to the airport.

At trial, Dr. Vidino was once again called as an expert by the government. As has been the case in all his court appearances, he testified not about Mr. Shafi personally (his thoughts, motivation, aspiration and belief) with whom he had no one-on-one experience, but rather about terrorist organizations in general.[34] Dr. Vidino testified at length about the background of al-

---

[34] In contrast to Dr. Vidino, Moustafa Ayad the Head of International Communication Programmes for the Institute for Strategic Dialogues, a non-profit global counter-terrorism organization, will not render an opinion of an "individualized assessment of a defendant's risk of recidivism" at sentencing in the absence of meeting with the defendant beforehand. A qualified expert in Islamic extremism and strategies to counter violent extremism and manager of the Programmes Against Extremism Network, a group of former extremists and survivors of extremist events that conduct interventions, public peaking events and programming to stop the tide of violence, polarization and extremism globally, Mr. Ayad notes personal interaction with an individual is essential because "every individual case is different." Like factors to be considered in a reviewing an individual's decision to join an extremist organization Ayad notes risk assessment must weigh and balance "grievances around status regarding feelings of persecution, socio-economic status, mental health issues and the need for a purpose sort of driven life and a sense of community and identity." *See* United *States v. John Doe*, 14-cr-00612-001(EDNY 2018)(Weinstein,J.)

In that same case, Dr. Vidino's colleague, Seamus Hughes, Deputy Director of George Washington University's Program on Extremism, agreed with Mr. Ayad that there is no generic marker system as to whether one will join an extremist organization or recidivate if released from prison. A former intelligence policy officer for the National Counter Terrorism Center and Senior Counterterrorism Advisor to the US Senate Homeland Security and Governmental Affair Committee, Mr. Hughes is a qualified expert on terrorism, homegrown violent extremism and strategies for countering violent extremism. Though not a "threat assessment professional" having spent some four hours interviewing John Doe and reviewing public filing on the case he was comfortable in submitting a risk assessment a to Doe and recommendation a to the term and conditions of supervised release were he discharged from prison. Testifying about the lack of de-radicalization programs in US prisons, Mr. Hughes opined that supervised release rather than prison can often be the best pathway to rehabilitation." I would share many

STANLEY L.COHEN

Nushra and ISIS, including their terroristic activities, history, propaganda, recruitment strategies, and other tactics. Though he attempted to match the conduct of Mr. Shafi to that profile, it was not persuasive. Deadlocked reportedly with 8-4 jurors in favor of acquittal, a mistrial was declared. Subsequently Mr. Shafi pleaded guilty; not to any terrorism offense, but to bank fraud related to cashing a bad check to finance his trip and was sentenced to some 48 months with the court noting that the government had failed to prove any terrorist intent. [35]

In the year that has passed since the submission of our initial sentence memorandum there have been other terrorism convictions where courts applying the statutory mandate of 18 U.S.C. § 3553 meted out punishment significantly less severe than the 27 years Mr. Kaziu originally received, but yet for conduct far more egregious than his.

Thus, in a consummated deadly terrorist attack which all at once shocked the world and ignited a domestic political firestorm that contributed to, then, Secretary of State Hillary Clinton losing the presidency, stands the prosecution in *United States v. Al-Imam*, 373 F. Supp. 3d 247(D.D.C. 2020)(Cooper,J.). Al-Imam, one of the named defendants prosecuted for the Benghazi, Libya attacks in 2012 was initially charged with Conspiracy to Provide Material Support and Resources to Terrorists Resulting in Death; Providing Material Support and Resources to Terrorists Resulting in Death, Killing of an Internationally Protected Person, U.S. Ambassador Stevens; three counts of Killing Officers and Employees of the United States, Embassy Officers Smith, Woods, and Doherty; and Attempting to Kill Officers and Employees of the United States, Embassy Officers Wickland, Ubben, and Geist.[36]

---

of my colleagues view on this . . . on the narrow question of rehabilitation I think a lot of those issues could be achieved primarily through supervised release." *Id.*

[35] *See, also, United States v. Rakhmatov* E.D.N.Y 2019 (32 years old convicted of conspiracy to provide material support to ISIS in a prosecution where Dr. Vidino testified for the government as an expert. Overt acts included providing money to fund travel of co-conspirator to travel and to join ISIS to fight and to purchase a firearm sentenced to twelve and a half years(the co-defendant was sentenced to but fifteen years, despite his more serious conduct including attempting to fly to Turkey to travel to Syria); *United States v. Hendricks* No.:1:16-cr-265 (N.D. Ohio)(defendant convicted, *inter alia*, of conspiracy to provide material support to a foreign terrorist organization with overt acts that included trying to recruit people on social media to train and conduct terrorist attacks in the United States on behalf of ISIS, assisting a codefendant to purchase an AK-47 assault rifle and ammunition from an undercover law enforcement officer, with Dr. Vidino testifying about ISIS recruitment, means and methods, views and language used in communications. With a guideline range of up to 480 months, defendant sentenced to 180 months).

[36] Other charges in the indictment included multiple counts of Killing a Person in the Course of an Attack on a Federal Facility Involving; the Use of a Firearm or a Dangerous Weapon; Maliciously Damaging and Destroying U.S. Property by Means of Fire and an Explosive Causing Death; and Willfully and Maliciously Destroying Property within the Special Maritime and Territorial Jurisdiction of the United States and Placing Lives in Jeopardy.

STANLEY L.COHEN

According to the indictment on the day of the attack some two dozen men armed with assault rifles, handguns, and rocket-propelled grenade launchers—attacked the U. S. Mission setting fire to several buildings, causing the deaths of Ambassador Stevens and Sean Smith. 373 F. Supp 247 (referring to Ind. ¶ 22.). Surviving State Department personnel fled to its Annex, which soon came under attack as well with mortar fire that killed Tyrone Woods and Glen Doherty. *Id.* It was alleged that Al-Imam was a close associate of Abu Khatallah, the leader of the group that carried out the attacks. *Id.* ¶ 9. Al-Imam was "present for, helped orchestrate, and participated in the attacks" (*id.* ¶¶ 9-10) and afterward entered the Mission at the direction of Abu Khatallah and took sensitive material, including material that identified the Annex by location and as the evacuation point for State Department personnel. *Id.* ¶ 22. Subsequently, it is alleged, "Al-Imam assembled with Abu Khatallah and others to coordinate the attack on the Annex." *Id.*

Al-Imam was found guilty at trial of conspiracy to provide material support or resources to terrorists and one count of maliciously destroying and injuring dwellings and property and property and placing live in jeopardy within the territorial jurisdiction of the United States. In a subsequent Department of Justice press release extolling the sentence imposed the government noted "al-Imam played a significant role in the 2012 Benghazi attack , one that ultimately claimed American lives . . . today's sentencing is a reminder that the safety of Americans-whether at home or abroad- civilian or otherwise will always be our top priority." [37] Al-Imam was sentenced to 228 months. While Betim Kaziu guilty of little more than aspiration, talk and journey with no ensuing violence and or weapons, let alone death and destruction received a sentence of 324 months.

In United *States v. Dais*, 482 F. Supp. 3d 800 (E.D. Wis. 2020)(Adelman, J.), the court imposed a sentence upon conviction for attempting to provide material support or resources to a foreign terrorist organization to 90 months and not the within guideline maximum which the government sought as recommended by the pre-sentence report of 240 months to life. In *Dais* the defendant was "an accomplished hacker and identity thief. She taught others how to hack and posted a video of her hacking technique. In addition to hacked Facebook accounts, defendant maintained private channels on Telegram, an encrypted social media platform, on which she compiled detailed information about explosives, poisons, and other means of committing attacks. She shared links to these channels with followers who wanted information about how to commit attacks." *Id.* at 804-05. Long a supporter of ISIS, she used various social media platforms to promote and recruit new members for ISIS and to urge others who could not travel to areas it controlled to conduct domestic attacks on its behalf. One such follower planned an attack in France. Another was arrested after law enforcement disrupted his plan to bomb a house of worship in Pittsburgh. *Id.* Though the court concluded the defendant engaged in "disturbingly"

---

[37] *See* https://www.justice.gov/opa/pr/mustafa-al-imam-sentenced-more-19-years-prison-september-2012-terrorist-attack-benghazi-libya.

STANLEY L. COHEN

dangerous conduct including distribution of detailed information through videos "about bomb-making and biological weapons materials, for use by people who want to commit violent acts in the name of ISIS" which, according to FBI experts, demonstrated a "viable method" of preparing explosives, it nevertheless rejected the guideline enhancement of §3A1.4, noting that under the facts it "provided limited guidance in this case." *Id.* at 802-803.[38]

In *United States v. Velentzas*, 2019 U.S. Dist. LEXIS 12409 (E.D.N.Y. 2019)(Johnson, Jr.,J) the defendants, Noel Velentzas and Asia Siddiqui, were charged, *inter alia*, with Conspiracy to Use a Weapon of Mass Destruction and Teaching and Distributing Information Pertaining to the Making and Use of an Explosive, Destructive Device and Weapon of Mass Destruction.*Id* at *1. Eventually they both pleaded guilty to planning to make a bomb for use in an attack inside the United States.

Among the overt acts in furtherance of the conspiracy were a series of discussions between the two and an undercover agent (UC) pertaining to the use of pressure cookers packed with, potentially, other deadly items like those used by Tamerlan and Dzhokhar Tsarnaev's the "Boston Marathon bombers" to carry out their attack.*Velentzas*, 2019 U.S. Dist. LEXIS 124093 at *7. They further discussed the science of bombmaking and studied chemistry using library books and *The Anarchist Cookbook*. *Id.*at *7-8. Velenztas obtained a prepaid cellular phone which she used to view videos about soldering and circuitry which she began to practice. *Id.*at *8. Siddiqui and the UC went to Home Depot on occasion to learn more about the items detailed in the course book she was studying while Velentzas continued to research about transformers, homemade grenades, pipe and pressure cooker bombs, copper wires, small and large metal pipes and bags of sodium chloride which they believed were used in the 1993 World Trade Center bombing.*Id.*at *8-10. Velentzas made her home available to practice making smaller explosive devices and when she and the UC arrived at the home of Siddiqui, they found four propane tanks.*Id* at *10.

They also talked about how to detonate a bomb from afar, and the means of defending themselves from law enforcement capture through a knife attack and how to avoid law enforcement detection such as avoiding YouTube instructional videos not purchasing large amounts of bleach, removing sim cards to prevent the government from "taping their phones" and staying away from "Muslim places" where the government puts recording devices. *Id.*at *8-9

---

[38] In observing that §3A1.4 was enacted by a congressional directive lacking in any supporting "empirical evidence " the court rejected its significant mechanical upward adjustment, finding it often fails to account for the range of conduct covered by a given conviction.

STANLEY L.COHEN

Velentzas told the UC "people who read chemistry books over breakfast are people who make history." Siddiqui shared passages from library books on chemistry that she borrowed.[39] *Id.*at\*8

Siddiqui was sentenced to 180 months for her role in planning to build and use a bomb in a domestic terrorist attack, with Velentzas currently awaiting sentence. According to the government "inspired by radical Islam," Siddiqui and Noelle Velentzas were involved in teaching or distributing information regarding making and using an explosive, destructive device, or weapon of mass destruction to "kill Americans and fellow New Yorkers. Noting "lives were saved when the defendants plot to detonate a bomb in a terrorist attack was thwarted by . . . law enforcement" the government described the fifteen year sentence imposed upon Siddiqui as one which held her "accountable for her crimes." *See https://www.justice.gov/opa/pr/queens-woman-sentenced-15-years-imprisonment-teaching-and-distributing-information-about*.[40]

### D.    Neither DOJ nor the BOP has viewed Mr. Kaziu as a continuing threat

As fleshed out in our memorandum in chief, the specter of extremist recidivism and evidence of rehabilitation continue to be keystones to the sentencing calculus.[41] Although, to

---

[39] Along the way, Siddiqui became friends with Samir Khan a U.S. citizen who was a prominent Al Qaeda figure in the Arabian Peninsula and published a blog and magazine which promoted terrorism. He published one of her poems which promoted bombs, fists and slit-throats with "skies that rain martyrdom." She also wrote letters of support to those convicted of terrorism related offenses or awaiting trial on such charges. Among others were one arrested for plotting to blow up a Portland Christmas tree lighting ceremony and another doing an 86 year sentence for a variety of terrorism charge including taking an M-4 rifle from a U.S. serviceman in Afghanistan and attempting to fire it at soldiers. Often heard espousing support for the "Boston Marathon Bombers" Siddiqui called Osama Bin laden and his mentor her heroes and Velentzas praised the 9-11 attacks.

[40] *See, also, United States v. Hasanoff*, 2020 U.S. Dist. LEXIS 199816 (S.D.N.Y. 2020) (Wood, J.) and *United States v. El-Hanafi*, 460 F. Supp. 3d 502 (S.D.N.Y. 2020)(Wood,J.) where respective defendants granted compassionate release following convictions for attempting and conspiring to provide material support to Al-Qaeda including "video cameras, computers, encryption technology, and even remote cars that could be converted into bombs," as well as cash donations to it totaling $67,000. Hasanoff's original 216 month reduced to time served approximately 120 months sentence due to rehabilitation and family circumstances. El-Hanafi's sentence of 180 months reduced to time served (120 months) due to health conditions and in recognition that prolonging his incarceration would not achieve any deterrent value. *Id.* at 510.).

[41] Although discussed at length in the defendant's initial sentence memorandum it bears repeating that recent studies indicate that recidivism rates are significantly lower for those convicted of extremist crimes than "traditional" crimes. *See*, *generally*, https://ctc.usma.edu/overblown-exploring-the-gap-between-the-fear-of-terrorist-recidivism-and-the-evidence/ ("A number of academic studies have recently looked into the issue of terrorist recidivism in a more systematic manner. Omi Hodwitz compiled a dataset of 561 individuals convicted of terrorism-related offenses in the United States between 2001 and 2018.Only nine of them recidivated (1.6%), five of whom did so in prison. However, only three cases were linked to terrorism (radicalization of other inmates), thus bringing the actual rate of terrorist recidivism (in the narrow sense) down to 0.5%."); https://foreignpolicy.com/2020/02/20/entrepreneurship -terrorism-reintegration-recidivism/ ("A recent study released by West Point's Combating Terrorism Center, which

STANLEY L.COHEN

some degree, connected at the hip, on both scores Mr. Kaziu presents nothing rooted in fact to give Your Honor reason to pause. Having begun his incarceration in a high security pre-trial setting, in the years following his conviction he has worked his way down from a medium security facility and now to one at the low end. In fact, but for the face of the charges of which he was convicted he would, by now, likely be incarcerated in a camp. This easing in security designation is not simply rote companion to time spent behind bars, but must be earned. Betim Kaziu has done so.

There is nothing haphazard about the manner and means by which the Bureau of Prisons determines the security placement of an in-coming prisoner, little is left to chance.[42] Once designated, the BOP continues to monitor closely the activity of those convicted of extremist offenses with transfers to higher or lower security prisons based upon their activity within an FCI setting. Indeed, within the BOP, security restrictions are "severe" for those convicted of extremist offenses.[43] "Well Integrated into the counter-terrorism intelligence-sharing process . . . [the] BOP maintains a standalone counter-terrorism unit and a liaison to the Joint Terrorism Taskforce, allowing it to effectively communicate with law enforcement and intelligence agencies at the federal, state, and local levels." *Id.* Among other security steps, the BOP closely monitors all communications of these offenders with family and approved friends outside the prison and with fellow inmates, with their substance shared with law enforcement as appropriate.

---

examined nearly 30 years of U.S. data, demonstrates that recidivism rates among the most dangerous category of jihadi offenders, namely people directly involved in violent terrorist plots, are far below traditional criminal recidivism rates."); https://www.universiteitleiden.nl/binaries/content/ assets/ customsites/perspectives-on-terrorism/2019/issue-2/hodwitz.pdf (The "Terrorism Recidivism Study (TRS), a database collected with the sole purpose of filling in some of the blanks regarding recidivism rates and characteristics of individuals convicted of terrorism and terrorist-related offenses in the United States following 9/11[found] . . . out of the 561 offenders included in the TRS, only nine recidivated over the entire period of analysis. In other words, only 1.6% of the TRS sample recidivated between 2001 and 2018. . . All had been incarcerated for their original convictions, with an average sentence of 16.3 years and all who had been released had been granted supervised release, with an average of 5.2 years of supervision. All had a history of organizational affiliation, including Al-Qaeda, the Taliban, the Islamic State, Hezbollah, and Al-Fuqra. In addition to the low rates of recidivism, it is also noteworthy that five of the recidivists reoffended while still incarcerated, dropping the total number of released recidivists to four.").

[42] "Currently, [the] BOP utilizes the Extremism Risk Guidance 22+ (ERG22+), an assessment tool for determining inmate extremism. First developed in the United Kingdom, this psychological, interview-based assessment tools is used for evaluating radicalization within prison populations. Drawing from these metrics, and from other BOP classification and designation tools, case officers determine which security and custody conditions are acceptable for incoming extremist prisoners." *See,* for example, https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Prisons%20Policy%20Paper.pdf at p.4.

[43] *See* https://icct.nl/publication/rethinking-prison-radicalisation-lessons-from-the-u-s-federal-correctional-system/.

STANLEY L.COHEN

It also carefully scrutinizes, and can limit, visitors to those convicted of terrorism related offenses. *Id.*

If deemed necessary by the Department of Justice, a "Special Administrative Measure" (SAM) involving housing and correspondence may be implemented against a given inmate when it is alleged there is a "substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." Such measures are used to prevent acts of violence or terrorism or disclosure of classified information. *See* 28 CFR 501.3 and USAM Title 9 chapter 24.[44]

In this light, consideration of the relevant factors of 18 U.S.C. § 3553 should lead the Court to conclude that there is nothing before it that indicates Mr. Kaziu presents a cognizable hint, let alone identifiable risk of recidivism or that he has failed to take full advantage of his years in prison to become a better man and member of the community as he has worked day by day in preparation for his eventual reintegration into society.

Thus, despite an exhaustive preliminary evaluation as to whether he posed a continuing extremist threat, and on-going monitoring, at no time has the Department of Justice found a basis to impose a SAM against Mr. Kaziu. Nor has the BOP found that the defendant has engaged in

---

[44] Under a Special Administrative Measure (SAM) a directive can be authorized by the Attorney General for any inmate who is deemed to pose a current threat to national security or public safety. A SAM directive requires 100-percent live monitoring by the sponsoring law enforcement agency of an inmate's communications and can impose other restrictions on an inmate, such as limiting communications to immediate family. *See* https://oig.justice.gov/sites/default/files/reports/a20042.pdf. In addition pursuant to administrative measures, the BOP may impose special conditions of confinement including "housing the inmate in administrative detention [a communications management unit -CMU] and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representative of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of act of violence or terrorism."*DOJ* Manual 9-24.000, *Requests for Special Confinement Conditions.*). *See,* https://www.bop.gov/policy/progstat/5214_002.pdf .CMU designations are coordinated by the Counter Terrorism Unit (CTU) which reviews Pre-Sentence Investigation Report (PSR); the judgment in a criminal case (J&C); Statement of Reasons (SOR); DHO reports relevant to referral, such as communication-related misconduct; and Relevant SIS reports, PC investigations; Memos, letters. . . from courts, United States Attorneys' Offices, law enforcement officials . . . relating to the referral; any other information or intelligence related to the referral. Inmates may be designated to a CMU if evidence of the following criteria exists: (a) The inmate's current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism; (b) The inmate's current offense(s) of conviction, offense conduct, or activity while incarcerated, indicates a substantial likelihood that the inmate will encourage, coordinate, facilitate, or otherwise act in furtherance of illegal activity through communication with persons in the community; *See, i.e., United States v. Abu Ali*, 396 F.Supp 2d 703 (E.D. Va. 2005)(Lee,J.)(defendant accused of conspiring to provide and providing material support and resources to terrorists and a foreign terrorist organization, al-Qaeda, and receiving funds and services from the foreign terrorist organization challenges pre-trial imposition of a SAM;. *United States v. Al-Owhali v. Holder*, F.3d 1236(10thCir. 2012)(Prisoner challenges SAM's which, *inter alia*, prohibited him from corresponding with his nieces and nephews through letters, receiving two Arabic-language newspapers and a copy of former President Jimmy Carter's book *Palestine: Peace, Not Apartheid.)*.

STANLEY L. COHEN

activity which can be or was construed as extremist in nature. His communications in prison with fellow inmates and officers have been unremarkable and mirror exchanges with family and friends outside, containing not a hint of extremist anger or pro-extremist sentiment.[45] Throughout the defendant's movement from a medium to a low-level security setting, there have been no instances where any of his communications have been interdicted as a security risk, where he has been denied a visit from anyone on those grounds or where he was singled out for any restrictions whatsoever based upon his conviction or his conduct in prison.[46]

---

[45] *Cf. United States v. John Walker Lindh*, 212 Supp.2d 541 (E.D. Va.2002)(Ellis,J)(Charged with, *inter alia*, conspiracy to kill US nationals including a CIA officer who lost his life and joining al Qaeda where he received training with weapons and explosives and met Osama bin Laden, Lindh was released after 17 years of a 20 year sentence having pleaded guilty to supplying services to the Taliban and brandishing a rifle and hand grenades while fighting against the U.S.-backed Northern Alliance. Although Lindh initially expressed remorse, while in prison, his position publicly changed. Among other such statements Lindh said "he was proud to take part in the Afghan jihad." Identifying himself as Yahya, on another occasion he commented ISIS "was doing a spectacular job and later that "[t]he Islamic State is clearly very sincere and serious about fulfilling the long-neglected religious obligation to establish a caliphate through armed struggle, which is the only correct method."*See* https://www.nbcnews.com/politics/justice-department/letter-american-taliban-john-walker-lindh-said-isis-doing-spectacular-n1008871.).

[46] *Cf. Royer v. Fed. Bureau of Prisons*, 933 F.Supp 2d 170 (D.D.C. 2013)(Lamberth,J.)(Originally charged with conspiracy to levy war against the United States and conspiracy to provide military support to Al Qaeda, the defendant, who ultimately pleaded guilty to Aiding and Abetting the Use and Discharge of a Firearm During and in Relation to a Crime of Violence and Aiding and Abetting the Carrying of an Explosive and sentenced to 20 years brought action challenging BOP designation as a "terrorist inmate" at Terre Haute, a high security prison. Once there he was transferred to a Communication Management Unit under which he was not permitted to have any contact with the general inmate population, could only exercise in "steel cages," was denied access to college credit courses, jobs, or vocational training, had no access to the chapel, was not permitted to study religious topics one-on-one with other inmates in the CMU, was permitted only one 15-minute phone call per week, was allowed only two visits per month limited to two-hours each and were required to be noncontact separated by a concrete and glass wall.)(Royer was ultimately resentenced to time served, approximately thirteen years, after one of the counts he was convicted of was, like here, vacated pursuant to *Johnson v. United States* 576 U.S. 591 (2015); *Awan v. Lapin*, 2010 U.S. Dist. LEXIS 24974 (E.D.N.Y. 2010)(Defendant found guilty of conspiring to provide personnel to a terrorist conspiracy and sentenced to 168 months of imprisonment transferred to Special Housing Unit pending outcome of an investigation into allegations he had recruited inmates at another institution and used institution telephones to communicate with known terrorists and because of concerns [his] continued presence in general population posed safety and security risks based on his past attempts to recruit other inmates into a terrorist organization, and his use of institution telephones to communicate with known terrorists."); *Chesser v. Walton* 2016 U.S. Dist. LEXIS 151942 (S.D.Ill.2016)(Prisoner challenge to CMU limits placed on free exercise clause of religious beliefs at a Communication Management Unit at USP Marion where designated following conviction for communicating threats, soliciting others to threaten violence, and providing material support to terrorists and where some 23 other Muslims are also housed for mostly terrorism offenses.). *See, also* https://www.ojp.gov/pdffiles1/nij/grants/220957.pdf at pp.34-35 (Mohammed Salameh, Mahmud Abouhalima, and Nidal Ayyad—incarcerated at the BOPs' "super max" ADMAX in Florence, Colorado, for the 1993 World Trade Center bombing, wrote over 90 letters to Islamic extremists outside the prison

STANLEY L. COHEN

  Upon conviction Mr. Kaziu was not designated to a maximum or high level security prison. Nor at anytime over these past 12 years has he been transferred to a CMU as a threat to prison security and staff, to other prisoners or to the community-at-large, beyond its walls. To the contrary, as indicated in our initial sentence memorandum, the defendant has used his time in relatively, low- security confinement not just to reflect over long and hard hours about his crime, but to obtain his GED, to graduate from numerous self-improvement and academic courses, to practice his faith with calm reflection, to counsel other inmates in crises, to work hard at his various prison jobs and to visit periodically with family and friends without incident. [47]

<u>Conclusion</u>

*"When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions; his yearning for self-respect does not end; nor is his quest for self-realization concluded. If anything, the needs for identity and self-respect are more compelling in the dehumanizing prison environment." Procunier v. Martinez*, 416 U.S. 396, 411(1974).

  Almost half a century ago Thurgood Marshall penned these sage, timeless words. They speak to hope, redemption, and tomorrow  even for those whose experiential growth is forcibly circumscribed by the slam of prison bars and the repeated daily call of "count time . . . count time" for years to come. Prison can be a cold, brutal isolation of the body, unfortunately it's meant to be.  But for those who yearn to grow . . . even when entombed, the mind knows no such bounds.  As a teen, Betim Kaziu, a bullied school drop-out, found meaningless escape from the drone of his isolated life through a faith he neither understood nor observed. With few friends

---

between 2002 and 2004. Fourteen sent to prisoners in Spain who had connections to the terrorist cell responsible for the Madrid train bombings. Salameh also wrote several letters to Arabic newspapers, praising bin Laden as a hero.).

[47] Not at all novice in assessing the conduct and growth of those in prison for extremist crimes, the BOP has not and cannot take exception to this characterization of the defendant's life in prison. *See* https://www.counterextremism.com/sites/default/files/CEP%20Report_When%20Terrorists%20Come%20Home_120618.pdf (pp. 14-15)("For its part, the BOP has put together a robust and competent counterterrorism infrastructure that includes an administrator and assistant administrator to oversee collaboration and communication between BOP Liaisons such as the National Joint Terrorism Task Force at the FBI57 and the BOP's Counter Terrorism Unit (CTU). Their mission is to "identify and validate terrorist offenders in custody, provide translation and transcription services, monitor and analyze the terrorist offenders communications, produce intelligence products which enable staff to make informed decisions, develop and provide relevant counter terrorism training, and to coordinate and liaise with intelligence communities."58 In addition, the CTU has access to the complete communication and behavioral record of violent extremist offenders, understands the inner workings of the federal prison system.").

STANLEY L. COHEN

and even less emotional support, he wandered in search of purpose; instead he found futility and, ultimately, indoctrinated collapse. As Betim boarded that flight for Egypt years ago, it was for him an exhilarating flight from a tedious marginal job and a dark Bronx tenement. Driven, he imagined, by some noble call to defend his faith a world away even, if necessary, by violence, Kaziu was lost, chasing a surreal journey, like the kind many his age found in a front-row seat at the local cinema. Turning back the clock is impossible for us all. For a still relatively young man in prison for extremist views and voice, a constant, forever daunting challenge to prove he has rejoined the world of peaceful, acceptable purpose.

Do we as a society in the quest for justice assume that twenty-seven years in prison as opposed to fifteen is the guarantor of that desired end? Or is hope and rehabilitation just a tease, with that mechanical twelve-year difference really all about retribution and little else? That is what the government proposes, and that is the question which will soon face this Court.

Betim Kaziu will in short order stand before Your Honor for a de novo resentence; not the boy he was when swept up into a stream of ignorant rhetoric and propaganda but a man who has spent a dozen plus years regretting every word, every step, every moment of his rash, juvenile leap into a world, for him, of little more than geopolitical intrigue and drama. Make no mistake about it; we do not suggest that his conduct, even expressed aspiration, was not serious or criminal . . . surely it was. But, yet, as time has told, sentencing for non-violent material support charges, particularly those of aspiration alone, with no consequence or meaningful steps towards it, has surely begun to back away from what was, in the shadow of 9-11, a punishment of cast away the key and a life along with it.

Although for the reasons set forth we take exception to the submission of the government's expert. Several years ago he penned an observation with which we agree whole heartedly: "It is unobjectionable that individuals who have paid their debt to society, no matter what their crimes, should be granted their freedom." [48]

Betim Kaziu has paid his debt to society and deserves a second chance at a new life beyond the walls of a federal prison. He has a family, employment and a stable home-life awaiting him. It will not be easy as the tattoo of extremist is one that fades only with the passage of considerable time, effort and success. The world Mr. Kaziu will eventually reenter will in technology, tenor and tone be a very different place from the one he last knew years ago, with challenges that will test him daily. Though his parents are no longer young they can and will provide the kind of love and support needed to assist him with that reentry. His siblings are now parents themselves or well on the way to becoming one. Yet, to them, he will always be the beloved big brother who they have missed dearly and for whom they have prayed daily for his release. They too are prepared to walk with him through the confusion, at times turmoil that predictably awaits any prisoner who has lost their freedom for a dozen or more years no matter what his or her crime. Times for Mr. Kaziu will be tough to be sure. But all the objective criteria before this Court should lead it to conclude that it is not a trial beyond his commitment or capacity to safely, responsibly and lawfully navigate.

---

[48] https://www.lawfareblog.com/americas-terrorism-problem-doesnt-end-prison%E2%80%94it-might-just-begin-there., Lorenzo Vidino, Seamus Hughes (June 17, 2018).

STANLEY L.COHEN

For all the reasons hereinabove set forth and on the basis of his original re-sentence memorandum and its attachments, it is respectfully submitted and requested that a sentence no greater than fifteen years, accompanied by a substantial period of strict but supportive supervised release, would be a reasonable and appropriate resolution in the matter of Betim Kaziu.[49]

.

Respectfully submitted,

Stanley L. Cohen, Esq.
Co-counsel


Geoffrey Stewart, Esq.
Co-counsel


Cosmo Pappas, JD Candidate 22
Executive Editor,
Michigan Journal of Race and Law
Michigan Law School


cc: Clerk of the Court (FB) (by ECF)
    Counsel of record (by ECF and E-Mail)

SLC/brl

---

[49] As of November 1, 2018, the 101 Americans sentenced to prison for ISIS-related activities received an average sentence of 13.2 years in prison—with 27 serving sentences of five years or less. *See*, *https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/Prisons%20Policy%20Paper.pdf* at p. 13.